COMPUTER IDENTICS CORPORA-
TION, Plaintiff, Appellant,

v.

SOUTHERN PACIFIC COMPANY, et
al., Defendants, Appellees.

No. 84–1277.

United States Court of Appeals,
First Circuit.

Argued Nov. 9, 1984.

Decided March 7, 1985.

Stephen A. Hopkins, Boston, Mass., with whom Paul Killeen and Sherburne, Powers & Needham, Boston, Mass., were on brief for plaintiff, appellant.

Jerome P. Facher, Boston, Mass., with whom Robert D. Keefe, James C. Burling, John F. Batter, III and Hale & Dorr, Boston, Mass., were on brief for defendants, appellees.

Before BOWNES, BREYER and TOR-RUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This is an action alleging a conspiracy under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (the Act).[1] It is before us on appeal by Plaintiff Computer Identics Corporation (Computer Identics)[2] from a jury verdict in favor of defendants-appellees Southern Pacific Company (Southern Pacific), a holding company, its wholly owned subsidiary, Southern Pacific Transportation Company (SPT), a railroad operating company, TOPS On-Line Services, Inc. (On-Line), a computer consulting service, and Strong-Wishart & Associates (Strong-Wishart), transportation management consultants. The core of Computer Identics' allegations was that appellees conspired to restrain trade by damaging its position in the market for computerized control systems used in railroad operations.

On March 1, 1984, after a lengthy trial, the jury answered an interrogatory specifically finding that there had been no conspiracy among any of the defendants and thus returned a verdict in their favor.

---

1. Shortly before trial, Plaintiff waived its claim of conspiracy and attempt to monopolize under Section 2 of the Act.

2. The complaint was originally filed in 1976 by Computer Identics and its wholly owned subsidiary, ACI Systems Corporation (Systems). In 1980, after Systems merged with Computers Identics the complaint was amended, leaving Computers Identics as the only plaintiff, seeking recovery in its own right and as successor to all claims asserted by Systems.

That finding being the fundamental issue underlying this action and appeal, the question before us is reduced to a determination of whether any error was committed in connection therewith. Having made timely objections to the jury instructions, alleging that said instructions were incomplete, confusing, inadequate and erroneous, Computer Identics seeks a new trial.

The relevant facts are as follows:

After testing various processes for automatically identifying railroad freight cars, the Association of American Railroads (AAR), in 1967, experimentally adopted technology, developed by the Sylvania company, which uses retro-reflective labels affixed to railroad cars.[3] At that time AAR amended its rule dealing with the physical characteristics of freight cars being interchanged between railroad lines, requiring that cars in interchange must be equipped with ACI labels, which could only be read by scanners employing the Sylvania technology. Appellant was a supplier of this technology.

Following the adoption of this rule, the railroad industry began the task of labeling the almost two million cars then in use. By the early 1970's, nearly 95% of the rolling stock had been labeled at some time. Nothing in the AAR's ruling, however, required that the railroads purchase the scanners or actually use the technology. Therefore, although there was a potential market for over 10,000 scanners, only about 400 scanners were actually sold to the entire railroad industry between 1967 and 1975. During this period Systems and Computer Identics began to expand their interests into the development of complex computer based operational control systems (CBOCS), with their optical scanners as the cornerstone of these systems.

Systems and Computer Identics, however, were not the only companies developing and implementing CBOCS. Appellee SPT had also developed, for its own use, a system commonly referred to as TOPS, which consisted of sophisticated centralized computing equipment with remote terminals located throughout its rail system. Its computer software programs were continually revised and updated. In 1969, Southern Pacific management decided to cash in on the development of TOPS and on the expertise gained by SPT in the process, through the establishment of a new company organized to sell the system to other railroads. Known as TOPS On-Line Services, the company was formed as a wholly separate corporation with Southern Pacific owning 80% of the stock and 20% being owned by Strong-Wishart. The TOPS system was not based on optical scanners nor was it designed for individual railroad yard control but, rather, was primarily designed for the central control of large railroad systems. When marketed to other railroads, the system software was not sold, but was made available at no cost to system purchasers who could then modify it to suit their particular needs, or pay On-Line and Strong-Wishart to do it for them. Appellant alleges, therefore, that Strong-Wishart/On Line and Computer Identics/Systems were competitors insofar as their business involved offering the "product" which consisted of the design and implementation of CBOCS in North American railroads.

By 1973, railroads using the scanner technology were experiencing serious labeling problems and deficiencies, including label mislocation and misapplication and unreadability due to dirt, damage and other causes. The label readability fell well below the 95% level, which some railroads considered a minimum, declining to 80% and continuing its downward trend.

By early 1974, some railroad officials expressed concern about the willingness of individual railroads to cooperate in labeling the cars and maintaining them. They criticized the technology as inherently ineffec-

**3.** This optical technology which is known as automatic car identification (ACI), is a process whereby electronic scanners are used to "read" alpha-numeric information coded upon reflec-

tive labels in the form of bands or strips of different colors, arranged in a row on the side of the cars. Each railroad car is assigned its own individual code for identification purposes.

tive. The AAR decided to continue the label rule for another two years of evaluation. Several major railroads began an intensive label cleaning and maintenance improvement campaign in an effort to increase label readability to a useful level. Potential customers of scanner technology, however, adopted a "wait and see" attitude toward the purchase of optical ACI equipment.

In early 1975 a course of events began among Southern Pacific, SPT, On-Line, and Strong-Wishart which appellant alleges was a conspiracy to undermine railroad industry support for label scanner technology and to destroy its prospects for business in the CBOCS market. In April of that year, James W. Germany, an executive of both On-Line and SPT, sent a memorandum to SPT Vice President Richard Spence, characterizing the intensive label maintenance programs as unsuccessful and recommending that optical ACI technology be discontinued. Spence later recommended to an influential committee of the AAR that the system be abandoned. In June, he ordered that label maintenance be discontinued at the West Colton railroad yard, and that ACI labels not be applied to new cars, although the price of such application was included in the cost. When knowledge of Southern Pacific and SPT's action spread through the industry via trade magazine articles, other railroads followed suit. In December, 1975, the AAR Board of Directors voted to continue the technology but without mandatory maintenance.

The plaintiff presented evidence related to its efforts to secure the contract to provide CBOCS for the Ferrocarriles Nacionales de Mexico (Mexico), evidence from which it believed the jury could infer that the appellees improperly acted to influence Mexico's choice of an On-Line supported system. Computer Identics also alleges that it was denied the opportunity to fairly compete for the CBOCS contract for the entire Conrail system when in 1976, Spence, who had left SPT and joined Conrail the previous year, set up a "study

team" to recommend the computer systems. The team was made up of persons who, with one exception,[4] were representatives of railroads which were users of the TOPS systems obtained from SPT. Computer Identics alleges that for this reason the Systems proposal was neither reviewed nor considered by Conrail in their evaluation.

Plaintiff sold no ACI based systems subsequent to 1974. In November, 1977 the AAR formally voted to rescind the interchange rule requiring the application of labels to cars.

In order to prove a conspiracy under Section 1 of the Act, a plaintiff is required to present direct or circumstantial evidence that reasonably tends to establish that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corporation,* —— U.S. ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 *reh'g denied* —— U.S. ——, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984); *Edward J. Sweeney & Sons Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3rd Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); accord *H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2nd Cir. 1981), *cert. denied* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). In doing so, the plaintiff is obliged to produce evidence "that tends to exclude the possibility that [the defendants] were acting independently." *Spray-Rite Service Corp., supra,* 104 S.Ct. at 1471.

On appeal we are required to test the legal sufficiency of the charge against these rules of law, and the facts as indicated. In this respect we must be mindful that although all parties are entitled to an adequate jury charge upon the controlling issues in the case, the court need not employ the precise language urged by any party. *See McKinnon v. Skil Corp.,* 638 F.2d 270, 274 (1st Cir.1981); *Wolff v. Puerto Rico,* 341 F.2d 945, 946 n. 1 (1st Cir. 1965). It is sufficient if the appropriate

**4.** The one exception was a consultant who was not affiliated with any railroad.

principle of law is correctly stated in the actual instructions given by the court. *See Harrington v. United States*, 504 F.2d 1306, 1317 (1st Cir.1974); *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir.), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). In our appellate function, we must also be satisfied that the instructions do not confuse or mislead the jury with regard to the applicable principles of law.

■ Our review of the jury instruction regarding the conspiracy issue shows that the essential elements were adequately covered. In charging the jury, the District Court included the following:

[T]he conspiracy or combination in the law is an agreement by two or more persons or entities ...

A plaintiff has a burden of proving by a preponderance of the evidence that two or more companies through the representatives thereof formed a common plan, scheme, or design to suppress actual competition in a relevant market and that they took steps in furtherance of that plan, that those steps were designed to harm competition unreasonably.

.      .      .      .      . .

Keep in mind the simple fact that two people may act similarly does not allow one to infer that they may therefore may (sic) have conspired or agreed with one another. The plaintiff has to prove the agreement, not just actions that are consistent with one another. On the other hand, an agreement need not be in writing. An agreement need not be expressed verbally. It indeed may be implied from conduct, but the agreement must be found to have existed. Now, the promotion of one's own product and the criticism of the product of another is not in and of itself illegitimate business conduct. However, if it constitutes one of a number of tactics used to restrain competition unreasonably, then it becomes illegitimate.

■ The Court also instructed the jury on the factual essentials of the plaintiff's conspiracy claim:

The plaintiff says, at least in part, that the conduct of persons representing the defendants and statements by them had an adverse, unreasonable impact on competition in the relevant market and caused injury to the ability of the plaintiff to market its products, that conduct being at least in part circulation of the so-called Germany memorandum in April of 1975, the decision of Southern Pacific to stop using scanners, and instructions given by Southern Pacific that labels should not be placed on new cars manufactured for SP. Plaintiff says that violated an AAR inter-change rule and the plaintiff also alleges criticism thereby of the plaintiff's products.

While appellant would have preferred a charge which placed more emphasis on the inferences that could be drawn by the jury from the defendant's actions, we do not find that those acts reasonably implied the existence of a conspiracy by appellees. Inference is the process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted. *Volkswagen of America, Inc. v. Nickel*, 429 F.Supp. 495 (E.D.Pa.1977). To have given more emphasis to what could be inferred from Computers Identic's evidence, might have been construed as directing the jury toward a verdict for the plaintiff/appellant, something to which said party was not entitled from the state of the evidence.

■ Appellant also takes issue with the jury instruction relative to the ability of the parties to conspire with one another. The Court's charge on that subject consisted of the following:

Now, you are going to have to decide on the evidence in this case whether the defendants operated independently of one another. If the defendants were so closely related *that they were in fact one entity*, there can be no conspiracy. A conspiracy is a combination of an agreement, and an agreement requires more than one entity. Otherwise, it is theoretically impossible to have a con-

spiracy. So there must be more than one entity capable of entering into an agreement with each other. And you have to decide from the evidence in this case *whether there was more than one entity among the four named defendants.* Consider the evidence that you have heard concerning the activities and the conduct of the four entities named.[5]

Later the Court instructed:

I repeat, a conspiracy or a combination is an agreement to achieve an unlawful object by two or more independent entities, and it is up to you jurors to decide whether the defendant corporations *acted as a single entity* sharing common management which made decisions controlling all four or whether they operated as independent persons, in quotes, so to speak. If they controlling all four or whether they operated independent persons, in quotes, so to speak. If they operated separately, then they are capable of conspiracy. If they acted as one common entity, then they could not enter into a conspiracy.[6]

Appellant claims that this instruction was tantamount to giving a directed verdict for the defendants because it was contrary to the prevailing law in this Circuit at the time of trial. *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 557 (1st Cir.1974). We find this observation to be incorrect. This Court, in *Whitten*, did hold that a conspiracy in violation of the Act could be formed by "closely related" companies which did not act independently. In that nonjury case, however, we treated the issue of intracorporate conspiracy as a factual matter, which in the case at bar would be a proper issue for the jury's determination. *See Murray v. Toyo-*

*ta Motor Distributors, Inc.*, 664 F.2d 1377, 1379 (9th Cir.1982); *Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 589–90 (8th Cir.1981). The trial court in the present case instructed the jury that the defendants would have had to act as *one entity* both *in fact* and *in action.* This we find to be more specific than the characterization alleged by the appellant in his brief, i.e. "closely related" or "not independently operated."[7]

Appellant further contends that the trial court erred in refusing to charge the jury that they might find a conspiracy between a defendant and a non-defendant. In its amended complaint Computer Identics alleged that Spence and Biaggini, who was the President of both Southern Pacific and SPT, were co-conspirators of the defendant corporations, although not named as defendants individually. Appellant presented evidence to show that Biaggini held patents on magnetic marking technology which could, if ever developed, compete with optical ACI. It alleges that this gave Biaggini a personal, individual interest apart from that of his company. Computer Identics claims that Spence was capable of conspiring with the defendants during those relevant times when he was no longer an officer of SPT. That is, although he may not have been legally capable of joining the conspiracy at its inception while he was acting as an officer of SPT, he was later freed of this technical disability and could be viewed as joining, individually, in conspiratorial aims while at Conrail.

The district court found that there was no evidence to justify such an instruction. We agree. The line of reasoning presented by the appellants is mere speculation,[8]

---

5. Emphasis supplied.

6. Emphasis supplied.

7. Recently the Supreme Court, in *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), created the narrow holding that a parent corporation and its wholly owned subsidiary are not legally capable of conspiring with each other under Section 1 of the Sherman Act. When framing the issue, the Court stated, 104 S.Ct. at 2740:

"We do not consider under what circumstances, *if any*, a parent may be liable for conspiring with an affiliated corporation *it does not entirely own.*" (Emphasis ours).

8. As defined by *Jaramillo v. U.S.*, 357 F.Supp. 172, 175 (D.C.N.Y., 1973), quoted in *Black's Law Dictionary*, 5th Ed. West Publ. Co., 1979, speculation is the art of theorizing about a matter as to which evidence is not sufficient for certain knowledge.

upon which neither the court in a nonjury case nor jurors in a jury case may base its verdict. The evidence presented to prove Biaggini's motive to conspire shows a possibility of personal gain too remote to be considered anything more than conjecture. Likewise, Computer Identics failed to present evidence to prove that once Spence switched his affiliation to Conrail, he did not work in that company's best interest, or, for that matter, that he would personally gain by Conrail's choice of computer system.

Appellant has accurately stated in his brief that by 1974 its potential customers had adopted a "wait and see" attitude. In addition, Computer Identics accurately states that the Germany memorandum and other criticism was directed toward the use of Sylvania technology in the railroad industry.[9] That is, that due to the increasing problems with the optical identification, the railroads were not purchasing any of the ACI systems until its feasibility became settled. In the light of the problems existing prior to the actions taken by defendants, it seems clear that appellants' future in providing optical scanner systems to the railroad industry was uncertain at best. On the basis of all the evidence presented, we find that the jury instructions regarding the allegations of conspiracy were adequate.

*Affirmed.*

---

**9.** Appellants have not cited any part of the record in which there is any evidence of direct criticism of its products.