Frank J. MACHOVEC, Ph.D., et al., Plaintiffs,

v.

COUNCIL FOR the NATIONAL REGISTER OF HEALTH SERVICE PROVIDERS IN PSYCHOLOGY, INC., et al., Defendants.

Civ. A. No. 84–0702–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 2, 1985.

David Barmak, Sherman, Meehan & Curtin, P.C., Washington, D.C., Randall Ogg, Fairfax, Va., for plaintiffs.

Allen R. Snyder, Clifford D. Stromberg, Hogan & Hartson, Margaret F. Ewing, Donald N. Bersoff, Ennis, Freedman, Bersoff & Ewing, Washington, D.C., E. Waller Dudley, C. Torrence Armstrong, Booth, Prichard & Dudley, Alexandaiv, Va., Warwick R. Furr, II, Lewis, Mitchell & Moore, Vienna, Va., for defendants.

## MEMORANDUM OPINION

CACHERIS, District Judge.

This is an antitrust case in which three of the four plaintiff psychologists have been refused listing in the "National Register,"

which lists the names and credentials of licensed or certified psychologists. The remaining plaintiff never applied for listing in the National Register, but alleges injury nonetheless.[1] Defendants are the Council for the National Register of Health Service Providers in Psychology, Inc. ("Council") and the American Psychological Association ("APA"). Plaintiffs allege that defendants have engaged in an illegal boycott and concerted refusal to deal with respect to the promotion of the National Register as a source of "qualified" psychologists in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, with relief sought under Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26. This matter is before this court after the close of discovery on defendants' Motions for Summary Judgment. For the reasons set forth below, defendants' Motions for Summary Judgment are granted.

## I.

## BACKGROUND

### A. Council and National Register

Council is an independent, nonprofit organization which periodically publishes and updates a book entitled the National Register which lists the names and data of licensed or certified psychologists who have met certain standards of education and training in the provision of health services. The National Register lists more than 13,500 psychologists of which more than 90% have gone through the review process and have been selected for listing in the National Register.

Defendant APA is a major national membership organization of psychologists. APA has over 50,000 members with varying psychological disciplines. As an association, the APA endeavors to "advance psychology as a science and profession, and as a means of promoting human welfare." APA Bylaws, Article I, Saah Aff. at ¶ 12.

---

**1.** Plaintiffs attempted to bring a class action suit; however, on December 3, 1984, Judge R.L. Williams of this court denied their Motion for Class Certification.

Plaintiffs Drs. MacHovec, Callahan, Hausman, and Brigham are psychologists. Drs. MacHovec, Callahan, and Hausman applied for a listing in the National Register and were not accepted because they did not meet one or more of the criteria for listing. Dr. Brigham never applied for listing; however, she alleges that she would not have been accepted if she had applied because she failed to meet the criteria.

In 1974, the Council was established by the American Board of Professional Psychology at the suggestion of APA for the purpose of developing a resource to identify health service psychologists who met minimum educational and training experiences. In nearly all states licensing of psychologists is generic in nature. Generally, no distinction is made for licensing purposes between psychologists with education and training in the provision of health services and psychologists with little or no education or training in the health area (*e.g.,* experimental psychology-animal research). Wellner Aff. at ¶ 20. Prospective patients have no way of ascertaining from the state licenses whether the psychologist is trained for health care services.

The net result of a generic license is that insurance companies, mental health agencies and other organizations found it difficult to identify psychologists qualified by training to provide health services. They often had difficulty investigating the background and training of each individual psychologist. Mundy Dep. at 130. The Council was established to help fulfill the need by developing and publishing a list of psychologists who met minimum training and educational criteria in the provision of psychological health services.

Specifically, in 1974, following deliberations and consultation with numerous members of the psychological profession, the Council formulated the following criteria:

(1) a current license or certificate by the State Board of Examiners of Psychology at the independent practice level of psychology;

(2) a doctoral degree from a regionally accredited educational institution; and

(3) two years of supervised experience in health services in psychology of which at least one year is in an organized health service training program and one year is post-doctoral.

\* \* \* \* \* \*

(4) applications by psychologists without a doctoral degree were accepted if the candidate: [2]

 a. had been licensed or certified as a psychologist for the independent practice of psychology by the State Board of Examiners of Psychology by January 1, 1975; and

 b. had his/her graduate degree granted a minimum of six years prior to January 1, 1975; and

 c. had at least six years of experience in psychology with at least two years in supervised (or equivalent) experience in health services, one of which was in an organized health service training program.

Wellner Aff. at ¶ 23–24. The grandperson provision of criteria (4) appears to be a compromise, arguably, a characteristic of any novel venture.

In 1978, the Council clarified its degree requirement by adopting guidelines for identifying doctoral degree programs in psychology. These guidelines were developed at a 1977 National Conference on Education & Credentialing in Psychology, which was attended by over thirty psychological organizations.[3] As a result of these endeavors, the Council specified its requisite degree to be that of a doctorate in psychology. In 1980, the Council developed additional guidelines specifying the

---

**2.** A psychologist admitted under the "grandperson" clause of criteria (4) was generally required to satisfy the first three criteria.

**3.** Similar guidelines have been adopted by the American Association of State Psychology

Boards, American Board of Professional Psychology, APA, and the Council for Graduate Departments in Psychology. Wellner Aff. at ¶ 27.

elements of an acceptable internship in an organized health services training program in psychology.

When a psychologist applies for a listing in the National Register an independent psychologist reviewer considers the application and supporting data submitted by the applicant, such as, college transcripts, and confirmation of supervised internship and post-doctoral experiences.

Before rejection of an applicant, a person must first have been considered and found unqualified under the criteria by each of three reviewers and a senior review board. All rejected applicants are notified of the right of appeal to an Appeal Board. The Appeal Board, which is independent of the National Register's Board of Directors, has nine members, five psychologists and four non-psychologist public members.

### B. *Plaintiffs as Applicants*

Dr. MacHovec's application for listing in the National Register was rejected because he attained his doctorate from the Fielding Institute, a "university without walls." The program lacked a full-time faculty and other indicia of a recognized doctoral program in psychology. At the time Dr. Mac-Hovec earned his degree, the Institute was not fully accredited. While maintaining a full-time job, Dr. MacHovec completed his "independent" study program in a mere *twenty-three months.* MacHovec Dep. at 381–82. Finally, Dr. MacHovec's internship program at the "Alaska Psychiatric Institute" was deemed unacceptable under the National Register's guidelines. *See* Wellner Aff., Attachment 3 ("Guidelines for Defining Supervised Experience In An 'Organized Health Service Training Program' ").

Dr. Hausman's application was denied because her doctorate degree was in Human Development, and not psychology. The Human Development degree was offered by the Institute for Child Studies of the Department of Education at the University of Maryland. In addition, Dr. Hausman's application was rejected because in her internship she acted as a "Coordinator" of services and not as a supervised educational intern.

Dr. Callahan, who held a doctorate in psychology, was similarly rejected because she completed only a specialized, narrow training experience in the therapeutic procedure of "psychodrama" at St. Elizabeth's Hospital. St. Elizabeth's did have an APA approved internship in clinical psychology, however, her application for admittance into the second year of the clinical internship was rejected by the program's director.

Finally, Dr. Brigham never applied for listing in the National Register, arguing that she would have been rejected because her degree from the University of Michigan was in Counseling and Guidance, not psychology.[4] After working in the counseling and guidance field, she later attempted to become recognized as a psychologist and health service provider.

### C. *Plaintiffs' Injuries*

According to the plaintiffs' Complaint, the alleged antitrust injuries can be summarized as follows:

(1) ineligibility for licensure;

(2) loss of employment opportunities;

(3) loss of referrals;

(4) loss of third-party reimbursement for patients;

(5) loss of reputation and professional standing; and

(6) loss of unspecified professional privileges and competitive advantages.

### 1. *Licensure*

State licensing boards regulate the licensing of psychologists, and the Council has never challenged the state board's authority. Here, all four plaintiffs are licensed to practice psychology. Likewise, plaintiffs have not shown any state which

---

4. In the case of Dr. Brigham, a request or demand is not necessary to establish an antitrust injury when, as here, the request would be futile. *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 743–44 (9th Cir.1984), *petition for cert. filed,* — U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) *cert. dismissed,* 53 U.S.L.W. 3620 (U.S. Feb. 26, 1985).

requires listing in the National Register as a condition for licensure or any state which has denied licensure because of non-listing.

### 2. *Employment*

Given the plaintiffs' deposition testimony, there is no evidence of lost employment opportunities because of non-listing in the National Register.[5]

### 3. *Referrals*

Plaintiffs are unable to specify a single referral lost because of non-listing. *See, e.g.*, MacHovec Dep. at 250 (unaware of any instance in which prospective patient or referral was lost because of non-listing). Indeed, the plaintiffs testified in depositions that they have successful psychological practices which are based predominately upon referrals from other professionals. Similarly, beyond the bare allegations of lost referrals, plaintiffs suggest two circumstances which support their contentions, namely, termination of referrals from Dr. Jean Ladkin and exclusion from the District of Columbia Psychological Association ("DCPA") "referral service."

Dr. Hausman has alleged that Dr. Ladkin ceased making referrals to her because Hausman was not listed in the National Register. However, Dr. Ladkin has stated "[t]hat [non-listing] has not deterred me from recommending and referring patients to Dr. Hausman and will not deter me from doing so in the future." Ladkin Aff. at ¶ 6.

Drs. Hausman, Brigham, and Callahan rely upon the exclusion from the DCPA referral service as evidence of lost referrals. Prior to January, 1984, they were denied listing in the referral service because the DCPA required listing in the National Register as a prerequisite for inclusion in the referral service. Notwithstanding the non-listing in the referral service, the events which occurred after Drs. Hausman, Brigham and Callahan were included in the service are highly instructive. For the period of January, 1984, to October, 1984, all three were unable to specify any DCPA referral which resulted in a patient and concomitant fees.

### 4. *Third-Party Reimbursement*

No evidence has been adduced that third parties use the National Register in such a way as to exclude non-listed psychologists from relevant markets or hamper their ability to practice psychology.[6] Charles E. Mundy, Jr., Manager of Federal Employees Health Insurance Program Office, Aetna Life and Casualty Co. ("Aetna"), testified on deposition that Aetna uses the National Register as one source to identify qualified psychologists, but it is not the sole source. Mundy Dep. at 12. Richard J. Luehrs, Executive Director of Operations for Blue Cross/Blue Shield Federal Employee Program, testified that Blue Cross/Blue Shield does not use the National Register as the sole basis in determining which psychologists are covered providers. Luehrs Dep. at 64, 68. Similarly, CHAMPUS does not use listing in the National Register as an essential criteria for reimbursement. *See* 32 C.F.R. § 119.10 (1984) ("clinical psychologist" defined).

Indeed, not one of the plaintiffs' clients has been denied reimbursement by any third-party payor, public or private, because of plaintiffs' non-listing in the National Register.

### 5. *Professional Standing*

It is urged that plaintiffs have suffered injury to their professional reputation and standing from non-listing in the National Register. At the same time, however, the

---

5. The following testimony from Dr. Hausman's deposition is illustrative of this finding:

> (Q) Have you ever been turned down for any employment whatsoever because of your not being listed in the National Register?
> (A) No.

Dep. at 322.

6. The National Register states in its preface, "The List is not, nor does it claim to be inclusive of all psychologists who meet the criteria. It is not designed to, nor does it purport to, evaluate the quality or competence of persons listed or the services provided by anyone listed or not listed in the Register." *See* Wellner Dep. at 601.

factual basis for that claim must be judged in light of the following facts:

—colleagues have not questioned the professional reputation of plaintiffs because of non-listing;

—plaintiffs have never been denied professional credentials or employment because of non-listing, *e.g.,* hospital privileges;

—potential patients and employers have never inquired of the plaintiffs about the non-listing; and

—plaintiffs have never been denied membership in professional organizations.

### 6. *Competitive Advantage*

Plaintiffs contend that by virtue of the listing of health care providers in the National Register, providers are not required to document their qualifications to insurance companies. In contrast, plaintiffs must document their qualifications with various independent insurers. Nonetheless, plaintiffs' supporting documentation is only required for the first claim, that is, once the determination is made, plaintiffs are then thereafter eligible for reimbursement. *See, e.g.,* Mundy Dep. at 141; *see* Callahan Dep. at 281–82; 592; Plaintiffs' Summary Judgment Motion Exh. No. 38 at 2. Finally, plaintiffs assert that many employers require or prefer listing in the National Register. Thus, plaintiffs are allegedly denied employment opportunities.

## II. LAW

### A. *Standard for Summary Judgment*

The threshold inquiry is whether this is an appropriate case for the entry of summary judgment. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any of material fact and that the moving party is entitled to a judgment as a matter of law.

Furthermore, under Rule 56(e), "[w]hen a motion for summary judgment is made ... an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response ... must set forth specific facts showing that there is a genuine issue for trial." *See Human Resources Institute of Norfolk, Inc. v. Blue Cross of Virginia,* 484 F.Supp. 520, 529 (E.D.Va.1980) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

Admittedly, the Supreme Court has cautioned that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles...." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969). However, Rule 56 is not to be

"read out of antitrust cases" or that every person who files an antitrust case is entitled to "get to a jury on the basis of the allegations of [his] complaint[s], coupled with the hope that something can be developed at trial in the way of evidence to support those allegations,...."

*Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139, 142 (4th Cir.1979) (quoting *First National Bank,* 391 U.S. at 289–90, 88 S.Ct. at 1592–93); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 (4th Cir.1985) ("Summary judgment clearly remains, however, an appropriate procedure in antitrust litigation."). As the Court instructed in *First National Bank,* without proof of "significant probative evidence tending to support the complaint," this case may be resolved by a motion for summary judgment. 391 U.S. at 290, 88 S.Ct. at 1593; *Terry's Floor Fashions,* at 610 (summary judgment dependent upon the particular facts of the case); *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502 (11th Cir.1985) (plaintiffs carry the burden to show "significant probative evidence of the existence of genuine issues of fact"). However, the

evidence must be reviewed in the light most favorable to the plaintiffs. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

**B.** *Section 4 of the Clayton Act: Antitrust Injury*

 Section 4 of the Clayton Act authorizes a private cause of action for treble damages by "[a]ny person who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15 (emphasis added). Such an action requires plaintiffs to prove an injury of "the type the antitrust laws were intended to forestall." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 486, 102 S.Ct. 2540, 2552, 73 L.Ed.2d 149 (1982) (Rehnquist, J., dissenting), *citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977). Similarly, in affirming summary judgment below, the Fourth Circuit Court of Appeals noted in *Stearns v. Genrad, Inc.,* 752 F.2d 942, 945 (4th Cir.1984), that "[a] violation of the antitrust laws is not compensible unless the violation has occasioned an antitrust injury." *See Shumate & Co., Inc. v. National Association of Securities Dealers, Inc.,* 509 F.2d 147, 152 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975) ("injury is the *sine qua non* for stating a[n] [antitrust] cause of action").

In assessing plaintiffs' position

[i]t must be borne in mind ... there are three essential elements in every private anti-trust action: ... (1) a violation of the anti-trust law, (2) a direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff. It follows, therefore, that a mere finding of violation does not result in liability ... [T]he crux of the action is injury, individual injury.

*Windham v. American Brands, Inc.,* 565 F.2d 59, 65–66 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978) (footnote omitted). The upshot of these decisions is that plaintiffs must prove " 'with a fair degree of certainty' " that the non-listing in the National Register resulted in antitrust injury. *McClure v. Undersea Industries, Inc.,* 671 F.2d 1287, 1289 (11th Cir.1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983) (quoting *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974)). Of course, with the denial of class certification, the focus is on plaintiffs' alleged antitrust injuries.

Here, regarding the issue of injury, plaintiffs have, as summarized earlier, alleged the following:

(1) ineligibility for licensure;

(2) loss of employment opportunities;

(3) loss of referrals;

(4) loss of third-party reimbursement for patients;

(5) loss of reputation and professional standing; and [7]

(6) loss of unspecified professional privileges and competitive advantages.

However, these allegations simply do not wash when the plaintiffs' own deposition testimony is perused. Generally, plaintiffs have adduced no evidence to show that they have been injured in their business or property as a result of not being listed by the Council in the National Register. *Cf. Computer Identics Corp. v. Southern Pacific Co.,* 756 F.2d 200, 204 (1st Cir.1985) ("promotion of one's own product and the criticism of the product of another is not in and of itself illegitimate business conduct").

It is undisputed that plaintiffs have not been denied state licenses as psychologists, indeed, all plaintiffs are licensed in various jurisdictions. Similarly, the evidence is un-

---

**7.** Personal injuries such as injury to reputation or standing are not cognizable under antitrust laws. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). Beyond this, the record reflects that plaintiffs

are members of the APA and have received, except for listing in the National Register, every credential for which they have applied. *See, e.g.,* Hausman Dep. at 51, 53; Brigham Dep. at 179–80.

equivocal that plaintiffs have never been denied third-party insurance reimbursement (*See, e.g.,* Brigham Dep. at 287) or professional privileges, *e.g.,* hospital privileges. *See, e.g.,* MacHovec Dep. 258–60. Moreover, the initial paperwork, wherein plaintiffs are required to demonstrate their qualifications for insurance reimbursement, places plaintiffs in a *de minimis,* if at all, competitive disadvantage. *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("Insignificant" restraints on competition are not prohibited.).

Finally, for similar reasons, the record is devoid of evidence to support the allegations of lost referrals and employment opportunities. As the record reflects, plaintiffs have successful psychological practices. *See, e.g.,* MacHovec Dep. at 99–106 (In addition to his full-time position, his private practice has grown from 52 hours in 1982 to 391 hours for the first ten months of 1984). Beyond this, plaintiffs Hausman, Brigham, and Callahan rely on the "potential" referrals lost due to their exclusion from the DCPA referral service. However, since listing in January, 1984, and ending in October, 1984, the referral service has not generated a single patient for the plaintiffs. In light of this evidence, the allegations of lost referrals are speculative and overstated. *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1495 (D.C.Cir.1984) ("significant evidence," "something more than naked assertions and broad generalities" must be shown to defeat motions for summary judgment) (citations omitted).

Similarly, the argument of lost employment is again unavailing. To begin with, plaintiffs' deposition testimony clearly demonstrate that plaintiffs have not been denied employment because of nonlisting. *See, e.g.,* Brigham Dep. at 286–87. At the same time, however, plaintiffs allege injury because a few employers require listing in the National Register as a necessary qualification for employment. *See* Plaintiffs' Summary Judgment Motion Exh. No. 64. Standing alone, of course, it

is insufficient to show antitrust injury. Like the remaining qualifications, the prospective employer has deemed it advisable to hire psychologists who satisfy the criteria for listing. In this sense, eligibility for listing in the National Register obviates the need to set forth a detailed list of similar qualifications. However, be it listing or eligibility for listing, it is apparent that the prospective employer has shown a preference in the market place as to the desirability of a candidate with specific psychological training and experience. *National Collegiate Athletic Association v. Board of Regents of University of Oklahoma,* — U.S. —, 104 S.Ct. 2948, 2964, 82 L.Ed.2d 70 (1984) (market responsive to consumer preference). We cannot distinguish these circumstances from any other prospective employer-employee relationship, and without proof that the National Register itself has occasioned an antitrust injury, this claim is mere conjecture.

Accordingly, under this record, this court is unable to parse the requisite antitrust injury for a Clayton Act § 4 private cause of action. *Cf. Amey, Inc.,* 758 F.2d at 1503 ("In the absence of conduct causing a restraint of trade ..., an individual has unfettered discretion in deciding with whom he will do business.") (citations omitted). Thus, summary judgment is appropriate. *See Stearns,* 752 F.2d at 945–46 (summary judgment appropriate absent any injury).

C. *Section 16 of the Clayton Act: Injunctive Relief*

Plaintiffs have sought additional relief under Section 16 of the Clayton Act which provides for a private cause of action for injunctive relief to "[a]ny person, firm, corporation, or association ... against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26. The focus of § 16 is the "threatened loss or damage" resulting from the antitrust violation. *Weiss v. York Hospital,* 745 F.2d 786, 829 (3rd Cir.1984), *petition for cert. filed,* — U.S. —, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Specifically, to be enti-

tled to injunctive relief, plaintiffs "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur" that proximately resulted from defendants' putative antitrust violations. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); *see* ABA Antitrust Section, Antitrust Law Developments (2d ed. 1984) at 404 and cases cited therein at n. 164.

■ In assaying the legal sufficiency of the alleged "significant threat of injury," we are persuaded by plaintiffs' inability to cite to any contemporaneous damages from which a reasonable inference of future damages could be drawn. Given plaintiffs' licensure, eligibility for insurance reimbursement, successful private practices, and professional credentials, there is good reason to conclude that a § 16 "significant threat" has not been shown.

D. *Section 1 of the Sherman Act: Conspiracy*

Section 1 of the Sherman Act requires proof of a "contract, combination, ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. In addition to proof of a conspiracy, plaintiffs must show:

(1) that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market;

(2) that the objects of and conduct pursuant to the conspiracy were illegal; and

(3) that the plaintiff was injured as a proximate result of the conspiracy.

*Terry's Floor Fashions*, at 610 n. 10, *citing Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195–96 (6th Cir. 1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984). As the Court of Appeals for the Fourth Circuit observed in *Terry's Floor Fashions*, "[c]oncerted action is the essence of a Section 1 claim." at 610–611. Indeed, the same Court noted "the well-settled rule that Section 1 does not proscribe independent action." *Id.* at 611, *citing Monsanto Co. v. Spray-Rite*

*Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

■ Plaintiffs must prove that each defendant had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co.*, 104 S.Ct. at 1473 (quoting *Edward J. Sweeney & Sons, Inc., v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)); *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946) ("a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"). At the same time, however, "direct proof of an express agreement is not required" and plaintiffs may rely on circumstantial evidence, such as inferences gleaned from the alleged co-conspirators behavior. *Terry's Floor Fashions*, at 611 (quoting *Edward J. Sweeney & Sons, Inc.*, 637 F.2d at 111). The parties agree that under the foregoing parameters, plaintiffs must show evidence of either an agreement, common scheme, control or coercion exercised to achieve an unlawful objective. *See, e.g., Kreuzer*, 735 F.2d 1479 (D.C.Cir. 1984); *Hester v. Martindale-Hubbell, Inc.*, 659 F.2d 433 (4th Cir.1981), *cert. denied*, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982); *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). However, as the Supreme Court recognized in *Maple Flooring Manufacturers Association v. United States*, 268 U.S. 563, 584, 45 S.Ct. 578, 585, 69 L.Ed. 1093 (1925), the mere exchange of information is insufficient to prove a conspiracy. *See, e.g., Kreuzer*, 735 F.2d at 1487.

■ Plaintiffs offer three salient areas of proof in support of their conspiracy allegation, namely, the National Register was established at the direction of the APA, members of the Council were (and are) APA officials and the APA has promoted the National Register as a source of "qualified psychologists."

To begin with, the Council was created by the American Board of Professional Psychology ("ABPP"), an independent organization not affiliated with the APA. Wellner Dep. at 25–26; Wellner Aff. at ¶ 4. Although the ABPP acted upon the request of the APA, the ABPP was free to reject the request, indeed, it cannot be concluded that the APA established the National Register. Moreover, the evidence is clear that the APA has had no hand in the election of the initial and subsequent Board of Directors. Saah Aff. at ¶ 21; Zimet Dep. at 51; Wellner Dep. at 25–26.

It is undisputed that some members of the Council's Board of Directors were (and are) APA officials. Notwithstanding the contacts with the APA, plaintiffs must prove "concerted action," not mere guilt by association. Indeed, it seems reasonable and plausible that the APA with over 50,000 members and fellows, fewer than 14,500 of whom are listed in the National Register, would deem it prudent and consistent with its professional responsibility to have representation on the Board. Saah Aff. at ¶ 19; Kreuzer, 735 F.2d at 1488 ("explanation [by defendants] is plausible and more logical than a theory of concerted action"). In contrast, many of the APA's Chief Officers are licensed psychologists, but are not listed in the National Register. Saah Aff. at ¶ 20. Moreover, professional involvement in the governance of multiple organizations is arguably quite common in the learned professions.

Contrary to the suggestion by plaintiffs that the consultation between the Council and the APA raises an inference of a conspiracy, this court, like the court in Kreuzer,

will not infer a conspiracy to violate the antitrust laws based on a showing of regular contact between two independent professional associations on general matters of mutual interest and concern. This is the very purpose and nature of professional associations and this court

will erect no barriers to accomplishment of this absent much more substantial evidence of a conspiracy to restrain trade than that adduced here.

735 F.2d at 1488–89. Similarly, the District Court in Virginia Academy of Clinical Psychologists, while noting the close cooperation between Blue Shield of Virginia and the Neuropsychiatric Society of Virginia ("NSV"), concluded:

Though prior inquiry, consultation, and negotiation clearly took place, no contract was entered into, no combination formed, and no conspiracy existed. Section 1 of the Sherman Act does not prohibit a business entity which needs information and advice from obtaining information and advice from other knowledgeable business entities. The operation of a medical insurance plan would be, for all practical purposes, impossible of [sic] consultation and cooperation with provider groups were barred.

624 F.2d at 479 (quoting Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 469 F.Supp. 552, 559 (E.D.Va.1979)). For similar reasons, the Fourth Circuit affirmed the District Court's ruling noting no control had been shown and "[i]t was not illegal for NSV ... to make recommendations aimed at persuading Blue Shield to adopt its proposal ... absent some form of coercion." Virginia Academy of Clinical Psychologists, 624 F.2d at 483. Here, as in Kreuzer and Virginia Academy of Clinical Psychologists, plaintiffs have failed to establish that the APA members controlled or were able to coerce the Council into an agreement to achieve the alleged concerted refusal to deal and boycott.[8]

Finally, plaintiffs rely on the APA's "promotion" of the National Register as evidence of the alleged conspiracy. It is true that the APA has made favorable references to the National Register as a source of psychologists in the health care services, however, there is no evidence to

---

8. For example, the evidence suggests a significant dispute between the Council and the APA with respect to the proper procedure in arriving at a definition of a "doctorate degree in psychology." See, e.g., Kilburg Dep. at 56–70, 78–80, 370.

suggest that the APA promoted the National Register as the primary source of qualified psychologists. *See, e.g.,* Saah Aff. Exh. B ["Psychotherapy and Psychologists" pamphlet]. More importantly, there is no proof that the APA's "promotion" of the National Register was of such a quantum that the APA could have wielded control over the National Register. Here, the Fourth Circuit's opinion in *Martindale-Hubbell* is instructive. If the American Bar Association's certification of "reputable" law lists or legal directories and Martindale-Hubbell's compliance with the ABA procedure "lies beyond the pale of even the most liberal extension of the concept of concerted activity," we are hard pressed to find it here. 659 F.2d at 436. Indeed, "[p]laintiff's conclusion or speculation as to existence of a conspiracy, without more, is not sufficient to establish a Section 1 violation." *Terry's Floor Fashions,* at — (quoting *Terry's Floor Fashions, Inc. v. Burlington Industries,* 568 F.Supp. 205, 210 (E.D.N.C.1983)). Thus, the essential element that animates today's ruling is that the defendants acted independently and in keeping with their professional obligations to consult with other associations in matters of mutual concern and interest.

### E. Restraint of Trade: Per Se v. Rule of Reason

Again, assuming, *arguendo,* the existence of the foregoing elements of a Section 1 of the Sherman Act cause of action, § 1 proscribes only unreasonable restraints of trade. *National Collegiate Athletic Ass'n.,* — U.S. —, 104 S.Ct. at 2959. For this court to assess the restraint of trade, plaintiffs must render proof of the "anti-competitive effects within the relevant product and geographic market." *Terry's Floor Fashions,* at 610 n. 10. The issue that remains is whether the putative anti-competitive practices are judged under a *per se* or rule of reason analysis. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691–92, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1981).

Specifically, plaintiffs have alleged a group boycott and concerted refusal to deal, which would, if found, dictate a *per se* analysis. *See, e.g., Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). Not unexpectedly, defendants claim that the National Register should be judged under a rule of reason analysis. *See, e.g., Kreuzer,* 735 F.2d at 1492.

Whether a particular activity falls within a *per se* or rule of reason analysis is hardly clear. As the Supreme Court candidly confessed in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* " '[t]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine.' " — U.S. —, —, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (quoting L. Sullivan, Law of Antitrust, 229–30 (1977)). The Court went on to state:

> A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have *predominately anticompetitive effects.* The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominately anticompetitive.

*Id.* at —, 105 S.Ct. at 2621 (emphasis added). After citing the authority in which a *per se* approach had been applied, the Court summarized the *per se* categories to include the following:

> In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete ..., and frequently the boycotting firms possessed a dominant position in the relevant market.... In addition, the practices were generally not justified by plausible arguments that were intended to enhance overall efficiency and make markets more competitive.... Although a concerted refusal to deal need not necessarily possess all of these traits

to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominately anticompetitive consequences.

*Id.* at ——, 105 S.Ct. at 2619 (citations omitted).

After examining the foregoing conclusions and the applicable criteria, this Court's determination is relatively easy. It is beyond peradventure that the defendants' acts have not "cut off access" to the health care services market. Plaintiffs have received and in all likelihood will continue to receive third-party insurance reimbursement and referrals from colleagues.[9]

Although plaintiffs' failure to define the relevant market becomes problematical, the Fourth Circuit in *Virginia Academy of Clinical Psychologists* observed that "psychologists and psychiatrists do compete; indeed it is susceptible to judicial notice." 624 F.2d at 485. In addition, the relevant market would, arguably, include counselors, psychotherapists, state licensed (non-listed) psychologists, and psychiatric social workers. To be sure, all 13,500 psychologists listed in the National Register do not compete in the same local market. Given the competition among the providers of psychological services, it can not be concluded, and nor has the plaintiffs proven, that defendants "possessed a dominant position in the relevant market" or had "the ability to raise prices above those that would be charged in a competitive market." *National Collegiate Athletic Ass'n.,* —— U.S. ——, 104 S.Ct. at 2965 n. 38; *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1566 n.

16, 80 L.Ed.2d 2 (1984); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n., Inc.,* 672 F.2d 1280, 1287 (7th Cir.1982) ("[M]embership restrictions by trade organizations not possessed of significant economic or operational leverage are more appropriately evaluated according to the standards of the rule of reason.").

Likewise, defendants have offered "plausible arguments" that would justify the National Register through enhancement of market efficiency and competition. For example, the Supreme Court has long held that the dissemination of information to consumers has a presumptively pro-competitive effect on the market. *Maple Flooring Mfrs.' Ass'n.,* 268 U.S. at 582–83, 45 S.Ct. at 586; *Cement Mfrs.' Protective Ass'n v. United States,* 268 U.S. 588, 604, 45 S.Ct. 586, 591, 69 L.Ed. 1104 (1925). Here, the National Register serves just such a function. With the inherent limitations of state generic licensure of psychologists, namely, clinical, counseling, school, and industrial/organizational psychologists are similarly licensed, the National Register fills a void by identifying psychologists that have specific training and experience in health care services. *See, e.g.,* Wellner Dep. at 113–14. The National Register affords consumers, including health plans and fellow mental health providers, access to accurate information which may form the basis of independent decision making in the marketplace. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979) ("Congress designed the Sherman Act as a consumer welfare prescription"); *see Safecard Services, Inc. v. Dow Jones & Co., Inc.,* 537 F.Supp. 1137, 1146 (E.D.Va.1982),

---

**9.** At arriving at this conclusion, we are persuaded by the deposition testimony of various insurance company representatives. For example, the following colloquy is telling.

Q Did you intend plans implementing [Federal Employee Program] to use the National Register as a sole basis for determining eligibility?

A No. I think I say that in that memo.

Q Did you ever tell anyone from any of the plans across the country to use the National Register as the sole basis for eligibility?

A No. In fact, we never told them to use it. We told them that it was available. We never told them .that they had to use it.

Q To your knowledge, did any of the plans use the National Register as the sole basis for determining eligibility to be a provider?

A Not to my knowledge.

Q Did you in your capacity ever hear of a psychologist being denied reimbursement under the Blue Cross FEP because he or she was not listed in the National Register?

A No.

Luehrs Dep. at 68.

*aff'd*, 705 F.2d 445 (4th Cir.), *cert. denied*, 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983) ("[I]t is an article of national faith that on balance the free flow of truth and reasoned opinion *enhances* competition") (emphasis original).

■ Under these circumstances, plaintiffs' *per se* argument is clearly unpersuasive. It is undeniable that plaintiffs have failed to make the threshold showing of "predominately anticompetitive effects." *Northwest Wholesale Stationers*, — U.S. at —, 105 S.Ct. at 2621. This is hardly a case of a paradigmatic group boycott or concerted refusal to deal in which price and output are restrained. Indeed, as more fully explicated below, there is no evidence that either have been effected by the publication of the National Register. This court may only invoke *per se* rules, with the presumption of anticompetitive effects, "when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *National Collegiate Athletic Ass'n.*, — U.S. —, 104 S.Ct. at 2962 (footnote omitted). Accordingly, when, as in this case, the "likelihood of anticompetitive conduct" is *de minimis*, a rule of reason analysis is dictated. *See, e.g., Kreuzer*, 735 F.2d at 1492; *Virginia Academy of Clinical Psychologists*, 624 F.2d at 484; *Ratino v. Medical Services of District of Columbia (Blue Shield)*, 718 F.2d 1260, 1271–72 (4th Cir.1983).

Having established that a rule of reason analysis is applicable, it is then employed "to form a judgment about the competitive significance of the restraint." *National Society of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. Any injury, however, is "confined to a consideration of impact on competitive conditions." *Id.* at 690, 98 S.Ct. at 1364; *National Collegiate Athletic Ass'n.*, — U.S. —, 104 S.Ct. at 2962 ("Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition.") (footnote omitted); *Terry's Floor Fashions*, at 610 n. 100.

■ Having already decided that plaintiffs have not incurred antitrust injury and that the rule of reason is applicable, the sole issue that remains is whether defendants' conduct resulted in anticompetitive consequences in the mental health services market. In assessing the competitive impact and for the sake of brevity, this court adopts its previous findings as applicable, *e.g.*, plaintiffs and other non-listed psychologists have open access to third-party insurance reimbursement. The corollary of this court's finding is that the National Register is not anticompetitive, indeed, it may enhance marketwide competition. *Northwest Wholesale Stationers*, — U.S. at —, 105 S.Ct. at 2619 ("enhance overall efficiency and make markets more competitive").

Under the Federal Employees Health Benefits Program, 5 U.S.C. § 8901, *et seq.* (1967 & Supp.1985), and CHAMPUS, 10 U.S.C. §§ 1071–1092 (1983 & Supp.1985), an insured is entitled to reimbursement for services provided by "clinical psychologists." Whether a mental health service provider is a "clinical psychologist," is left to the determination of insurance companies, such as Blue Cross/Blue Shield and Aetna. Eligibility determinations necessitated an individual analysis of "professional data forms" submitted by each prospective psychologist provider. *See, e.g.*, Mundy Dep. at 131, 141. As a practical matter, because of the costs and time associated with the process, Blue Cross/Blue Shield and Aetna opted to use the National Register as a non-exclusive source of information in making some eligibility determinations. *See, e.g.*, Luehrs Dep. at 27–28.

Thus, there is good reason to believe that the National Register enhances efficiency by expediting the adjudication of claims while not impeding the non-listed psychologist's access to the insurance market. Luehrs Dep. at 23.[10]

Finally, the same study reflects that the National Register has expanded the existing pool of eligible psychologists by approximately 3.8%. Mundy Dep., Plaintiffs' Exh. 170. The grandperson provision of

---

**10.** In an Aetna Report dated November 15, 1977, Mr. Mundy found that a "significant sav-

the National Register criteria, in effect, added psychologists to the competitive pool who prior to the inception of the Register were ineligible for insurance payment. *Id.* In addition, with listing in the National Register, counseling and school psychologists have been put in parity with clinical psychologists as recognized providers of mental health services. Saah Aff. at ¶ 30. In short, the evidence suggests that the National Register has increased the eligible pool of "clinical psychologists," and hence is pro-competitive.

## V. *Conclusion*

The National Register serves the public interest in efficiently disseminating information to the marketplace with respect to the training and experience of health care providers. The actions taken by the Council and the APA do not constitute a group boycott or concerted refusal to deal. Plaintiffs' allegations and "proof" have not even remotely approached the watershed tests of the applicable authority. Accordingly, Summary Judgment is granted in favor of defendants Council and APA.

An appropriate Order shall issue.

ings in terms of credentials review" would result from the use of the Register. Mundy Dep.,

Plaintiffs' Exh. 170.