### In re APPRAISER FOUNDATION ANTITRUST LITIGATION.

**This document relates to All Cases.**

**Master No. 93–MD–973.**

United States District Court,
D. Minnesota,
Fourth Division.

May 31, 1994.

Mortg. Underwriters, Inc., Nat. Ass'n of Real Estate Appraisers, Inc.

Kathleen Dunn Sheehy, James Borden Lynch, Peter Scott Hendrixson, Michael Eugene Florey, Dorsey & Whitney, John B. Orenstein, Inter–Regional Financial Group, Minneapolis, MN, for Appraisal Foundation.

Sue R. Halverson, Fredrikson & Byron, Minneapolis, MN, David Marx, Jr., Paula J. Krasny, Anne Pramaggiore, Amy J. Feinberg, McDermott Will & Emery, Chicago, IL, John P. Wintrol, McDermott Will & Emery, Washington, DC, for Appraisal Institute, American Institute of Real Estate Appraisers.

Kathleen Dunn Sheehy, James Borden Lynch, Peter Scott Hendrixson, Dorsey & Whitney, Sue R. Halverson, Fredrikson & Byron, Minneapolis, MN, David Marx, Jr., Paula J. Krasny, Anne Pramaggiore, Amy J. Feinberg, McDermott Will & Emery, Chicago, IL, John P. Wintrol, McDermott Will & Emery, Washington, DC, for Soc. of Real Estate Appraisers.

Laurie A. Zenner, Paul Robert Hannah, Hannah & Zenner, St. Paul, MN, Jerome C. Schaefer, O'Brien Birney & Butler, Washington, DC, for American Soc. of Appraisers.

Kathleen Dunn Sheehy, James Borden Lynch, Peter Scott Hendrixson, Dorsey & Whitney, Minneapolis, MN, for Nat. Soc. of Real Estate Appraisers.

James Borden Lynch, Peter Scott Hendrixson, Michael Eugene Florey, Dorsey & Whitney, Minneapolis, MN, Thomas H. Campbell, Lewis & Roca, Phoenix, AZ, for Roy Morris.

James Borden Lynch, Peter Scott Hendrixson, Michael Eugene Florey, Dorsey & Whitney, Minneapolis, MN, for Roy G. Green.

James Borden Lynch, Peter Scott Hendrixson, Michael Eugene Florey, Dorsey & Whitney, Minneapolis, MN, David E. Hudson, Hull Towill Norman & Barrett, Augusta, GA, for Joseph S. Durant.

---

D. Randall King, Merchant & Gould, Minneapolis, MN, Roy L. Shults, Mitchell Silberberg & Knupp, Los Angeles, CA, Joseph M. Alioto, Alioto Law Office, San Francisco, CA, Daniel R. Shulman, Shulman Gainsley Shulman Walcott & Davis, Minneapolis, MN, David Thomas Maddox, Fennemore Craig, Phoenix, AZ, Roy E. Paul, Susan Brown Paul, Bouhan Williams & Levy, Savannah, GA, for Nat. Ass'n of Review Appraisers and

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, Chief Judge.

Plaintiffs National Association of Review Appraisers and Mortgage Underwriters (NARA/MU) and National Association of Real Estate Appraisers (NAREA)[1] assert federal claims under the sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) and state common law claims for tortious interference with contract and prospective business relations against the defendants Appraisal Foundation (Foundation), its sponsors, and trustees. The court has jurisdiction under 28 U.S.C. §§ 1337 and 1367. Defendants[2] have moved for summary judgment.

### I.

In 1991, NARA/MU filed an antitrust action in this court against the Foundation and its sponsors.[3] The Foundation then brought a declaratory judgment action in 1992 against NAREA seeking a declaration that it had not violated the antitrust laws by refusing to admit NAREA.[4] NAREA counterclaimed, asserting similar claims against the Foundation as in the NARA/MU action. The cases were consolidated for pretrial and trial purposes, and NAREA amended its complaint to make it identical to the NARA/MU claims. Several additional cases involving claims against trustees of the Foundation were later transferred to this district for pretrial management.[5]

The Appraisal Foundation was created in 1987 to establish uniform appraisal standards and criteria for certifying appraisers through its Appraiser Standards Board (ASB) and Appraiser Qualifications Board (AQB). Each board consists of five members appointed by the board of trustees of the Foundation. In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which expressly adopted the standards set by the ASB and AQB. 12 U.S.C. §§ 3339 (uniform standards) and 3345 (qualifications).

Plaintiffs contend that they are being unfairly excluded from the Foundation. They argue this exclusion traces back to the beginnings of the Foundation. Plaintiffs claim the predecessor of the Foundation was the North American Conference of Appraisal Organizations (NACAO). NACAO had been formed in the early 1970's by defendants and five other appraisal organizations. These groups held an annual two day meeting where they exchanged business information and ideas. Plaintiffs claim outside organizations such as NAREA and NARA/MU were excluded.

In the mid 1980's, pressure began to build for regulation of the appraisal industry after developments with savings and loan institutions caused concern. Plaintiffs contend the members of NACAO decided to form the Foundation to set standards internally in an effort to head off government regulation. The Foundation was incorporated in 1987 with each of the member organizations contributing funds on a proportional basis according to the number of members it had.

---

1. For convenience, the parties were realigned pursuant to Management Order No. 1 dated August 2, 1993. Plaintiff NARA/MU and counterclaim-plaintiff NAREA are collectively referred to as "plaintiffs", and their claims and counterclaims are collectively referred to as "claims".

2. The defendants here are the Foundation, the National Society of Real Estate Appraisers (NSREA), the American Society of Appraisers (ASA), and the Appraisal Institute.

3. Civ. No. 4–91–294 (D.Minn.1991).

4. Civ. No. 4–92–620 (D.Minn.1992).

5. In the original cases NAREA and NARA/MU asserted claims against the Foundation, its spon-

sors, and the individual trustees. The trustees were dismissed for lack of personal jurisdiction. NAREA and NARA/MU then refiled claims against the trustees in the districts in which they live. All of those claims have been settled except three actions transferred here for pretrial purposes by the Judicial Panel on Multidistrict Litigation: *NARA/MU et al., v. Roy X. Morris et al.,* Civ. No. 4–93–573 (from the District of Arizona), *NARA/MU et al., v. Roy Green et al.,* Civ. No. 4–93–574 (from the Central District of California), and *NARA/MU et al., v. Joseph Durant et al.,* Civ. No. 4–93–575 (from the Southern District of Georgia). The dispositive motion filing deadline for the individual trustee cases was set for October 2, 1993, except for any motions which could only be brought after entry of judgment in the original cases. Management Order No. 1, August 2, 1993.

The eight founding appraisal organizations were "regular members" and were entitled to appoint between one and three trustees each, depending on the size of the organization.[6] There were also six "special members" which were organizations composed of users of appraisal services.[7] Each special member could appoint one trustee to the board.

Plaintiffs contend that under the Foundation's constitution and by-laws, the founding members retained veto power over all actions of the trustees. The original by-laws and articles of incorporation did not provide for vetoes, but founding members had the right to vote on proposed amendments to the by-laws and articles and each appointing organization could remove its trustee before expiration of the trustee's term under certain circumstances. Original By-laws §§ 4.01 and 5.02 (Defendants' Volume III Exhibit 1). The power of a sponsor to remove its appointed trustee before the expiration of the trustee's term was eliminated when the by-laws were revised. Effective January 1992, trustees could only be removed by a two-thirds vote of the board. Revised By-laws § 6.02(f).

In January 1991, the Foundation amended its by-laws to eliminate "memberships" effective January 1992. Three different types of sponsorship were created: Appraisal Sponsors, Affiliate Sponsors, and Corporate Sponsors. Appraisal Sponsors are appraiser organizations; this is the category to which plaintiffs wish to be admitted. Affiliate Sponsors are not appraiser organizations, but rather other non-profit, tax-exempt, organizations "having a demonstrable interest in the appraisal profession." Corporate Sponsors are for-profit organizations having a "demonstrable interest" in the practical use of appraisals and appraisal practices.

The board of trustees consists of one appointed trustee for each Appraisal and Affiliate Sponsor and at least 14 at-large trustees elected by the appointed trustees from a pool of candidates nominated by all three categories of Sponsors (Appraisal, Affiliate, and Corporate). Appraisal and Affiliate Sponsors who do not meet all of the sponsorship criteria are entitled to nominate an at-large trustee, but they may not appoint anyone to the board. Corporate Sponsors may nominate an individual to serve as an at-large trustee.[8]

Defendants maintain that virtually any interested organization may participate in the Foundation in one form or another, and NAREA and NARA/MU are the only organizations that have applied but have not been admitted to sponsorship. Since January 1991 the Foundation has admitted two new Appraisal Sponsors: the American Association of Certified Appraisers (AACA) and the National Association of Master Appraisers (NAMA).[9] Three organizations have become Affiliate members under the revised by-laws: The Mortgage Insurance Companies of America, the Farm Credit Council, and the National Association of Realtors. Organizations admitted as Corporate Sponsors include: Lender's Services, a subsidiary of the Prudential Insurance Company, and the Mortgage Guaranty Corporation. Defendants state there are no pending applications besides those of plaintiffs.

While NAREA and NARA/MU appear to defendants to qualify as Corporate Sponsors, they wish to be admitted as Appraisal Sponsors. The Foundation maintains plaintiffs simply do not meet the criteria to be Ap-

---

6. The original regular members were the American Institute of Real Estate Appraisers (AIREA), the American Society of Appraisers (ASA), the American Society of Farm Managers and Rural Appraisers, The International Association of Independent Fee Appraisers, the National Society of Real Estate Appraisers (NSREA), and the Society of Real Estate Appraisers (the Society).

7. The original special members were: the American Bankers Association, the American Real Estate and Urban Economics Association, the Mortgage Bankers Association, the Real Estate Edu-

cators Association, the Urban Land Institute, and the United States League of Savings Institutions.

8. The current board has 32 voting members consisting of 9 members appointed by Appraisal Sponsors, 9 by Affiliate Sponsors, and 14 elected at-large.

9. In addition, the Appraisal Institute was admitted as an Appraisal Sponsor after two existing Appraisal Sponsors, AIREA and the Society, merged. AIREA and the Society then withdrew from the Foundation.

praisal Sponsors. To qualify as an Appraisal Sponsor an applicant must:

1. be a non-profit, tax-exempt organization;
2. pay an initial fee of $18,800 and a pro rata share of the current dues assessed, and demonstrate a financial ability to pay on an ongoing basis;
3. adopt the Uniform Standards of Professional Appraisal Practice (USPAP), including the Ethics Provision;[10]
4. have an educational mechanism for teaching the USPAP, including the Ethics Provision, to its members and a disciplinary mechanism for enforcing them. A minimum five year history of standards, ethics, education and enforcement is preferred;
5. require all its appraisal designated members or persons seeking appraisal designations to complete at least 15 hours of classroom work on the US-PAP, including the Ethics Provision, every 5 years;
6. award appraisal designation(s) but not all members must be designated;
7. must require its appraisal-designated members to achieve, in the areas of education and experience, the minimum criteria adopted by the Appraiser Qualifications Board and must require its applicants to pass an examination. In addition, an organization must require its appraisal-designated members to achieve the continuing education prerequisites adopted by the AQB.

*See*, defendants' Exhibit 6.

Defendants contend that both NAREA and NARA/MU are not nonprofit organizations because each is owned and controlled by Robert Johnson and operated by his management company, International Association Managers, Inc. (IAM), a for-profit corporation. Johnson Deposition at 24. They point out that NAREA and NARA/MU are run out of Johnson's Scottsdale office building where no signs indicate NAREA and NARA/MU are located there. IAM has no written management contracts with NAREA and NARA/MU or the other organizations it services. *Id.* at 36. Johnson was paid $200,000 to $450,000 by IAM for his management services in the years 1989–1991, but does not know how the figures were arrived at. *Id.* 138–42. There are no documents reflecting how these fees were calculated. *Id.* at 152. Defendants believe the informal arrangements between corporations all owned and controlled by Johnson suggest that NAREA and NARA/MU are not really non-profit entities.

Plaintiffs claim the criteria for new admissions into the Foundation were not issued until two years after the Foundation became viable and that they have been continuously modified since. NAREA and NARA/MU applied for sponsorship in April 1989 and have complied with all requests for additional information since then. They argue that the founding members of the Foundation do not meet all the current admission criteria[11] and that new organizations have been admitted which have not met all the criteria. Plaintiffs argue that the American Association of Certified Appraisers (AACA), a for-profit corporation, was admitted on its promise that it would convert to a non-profit.[12] NAREA and NARA/MU argue they are being held to a higher standard than other applicants and are being forced to prove they satisfy each criterion.

Defendants argue summary judgment is appropriate because: 1) plaintiffs' claims against the Foundation are precluded be-

---

10. The Ethics Provision sets standards for appraisal practices as to conduct, management, confidentiality, and record keeping. As stated in the comment to the preamble, the Ethics Provision "emphasizes the personal obligations and responsibilities of the individual appraiser. However, it should also be emphasized that groups and organizations engaged in appraisal practice share the same ethical obligations."

11. Plaintiffs claim the National Society of Real Estate Appraisers (NSREA) for example, has no office, no employees, does not keep records of pass/fail for examinations, and waives some requirements for designations.

12. Defendants argue the admission was contingent on the association's meeting the criteria. Proof of compliance was provided, and admission was approved.

cause of the res judicata effect of their settlements of identical claims in separate actions against the trustees; 2) plaintiffs' Sherman Act Section 1 and 2 claims fail because plaintiffs cannot establish the existence of an agreement or combination to restrain trade or that the Foundation or its sponsors have caused any antitrust damage to plaintiffs; 3) the Section 1 claim fails under the rule of reason because plaintiffs cannot show competition has been harmed by the Foundation's enforcement of its membership criteria, or that the criteria constitute an unreasonable restraint of trade; 4) the section 2 claim fails because plaintiffs cannot prove intent to monopolize the relevant market; and 5) the tortious interference claim fails because plaintiffs cannot prove either an intentional act or the required level of causation under Minnesota law.[13]

## II.

■ Defendants believe plaintiffs' claims are now barred by res judicata. They argue that NAREA and NARA/MU split their causes of action against the Foundation by bringing separate, but identical, actions against a number of trustees in other districts. Seven of those cases have been dismissed with prejudice after settlements were reached. Defendants contend that because the Foundation is in privity with its trustees, all further claims against it are barred by final judgments on the merits in identical trustee actions.

NAREA and NARA/MU respond that the release of one alleged coconspirator in an antitrust case cannot be used to bar plaintiffs from prosecuting other alleged coconspirators unless the parties to the release specifically state an intention to release other coconspirators. Plaintiffs rely on *Zenith Radio Corp. v. Hazletine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

In *Zenith* the Supreme Court reversed a lower court ruling that the defendant was entitled to benefit from a release plaintiff had executed with other coconspirators. Extending the effect of the settlement would not be consistent with the aims and purposes of the treble damage remedy under the antitrust laws. *Id.* at 346, 91 S.Ct. at 810. The Court also recognized the problems inherent in management of multiparty and multidistrict litigation of these cases:

> We must keep in mind the multistate and multiparty character of much private antitrust litigation; often, defendants who have conspired together must be sued in a number of different states if all are to be reached, and, while defendants in some states may be willing to enter into settlements, defendants in others may not. To adopt the ancient common law rule would frustrate such partial settlements, and thereby promote litigation, while adoption of the First Restatement Rule would create a trap for unwary plaintiffs' attorneys. The straightforward rule is that a party releases only those other parties whom he intends to release. *Id.* at 346–347, 91 S.Ct. at 810.

Here the releases in the settled individual cases specifically reserve plaintiffs' rights to prosecute claims against the other defendants. Multidistrict and multiparty concerns are present. Jurisdiction over all the alleged individual coconspirators could not be had in any single district. Plaintiffs were forced to commence individual actions in a number of districts. Partial settlements are to be encouraged in complex litigation, and the release of some of the alleged individual coconspirators should not preclude the claims against the remaining defendants. Defendants' motion for summary judgment on the basis of res judicata should be denied.

## III.

Defendants argue that plaintiffs have not shown that they have valid antitrust claims so they should be dismissed. Plaintiffs respond that the record is sufficient to entitle them to present these issues to a jury.

Plaintiffs must show antitrust injury to prevail on their claims under Sections 1 and 2 of the Sherman Act. The parties dispute

---

13. Defendants also renew their contention that they are immune from antitrust liability under

the government instrumentality doctrine.

whether in this case antitrust injury should be analyzed under the rule of reason or the per se rule applicable to group boycotts. Defendants argue courts have consistently applied the rule of reason in antitrust cases challenging the rules of professional or trade associations. NAREA and NARA/MU contend that the Foundation's actions in excluding them from membership constitute a group boycott or concerted refusal to deal, and should therefore be deemed per se unlawful.

■ Only restraints on trade that are unreasonable are prohibited by § 1 of the Sherman Act. The reasonableness of a restraint is assessed under the rule of reason test,

> unless the challenged action falls into the category of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Northwest Wholesale Stationers, Inc., v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (citation omitted). Application of the per se rule turns on:

> whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to increase economic efficiency and render markets more, rather than less, competitive.

*Id.* at 289–90, 105 S.Ct. at 2617 (quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (citations omitted)).

■ The authority cited by plaintiffs for applying the per se rule here is distinguishable because their cases generally deal with a boycott that directly cuts off access to a supply, facility, or service necessary to compete in the market. *See, e.g., Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (denial of access to exchange members). Professional organizations like the Appraisal Foundation, established to promote professional standards and education, do not facially appear to restrict competition and decrease output. Such organizations must be able to establish reasonable rules in order to function effectively. *See, Northwest Wholesale Stationers,* 472 U.S. at 296, 105 S.Ct. at 2620. The membership criteria of the Foundation are facially reasonable, and thus should be analyzed under the rule of reason. *See, National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (applying rule of reason to case involving ethical rule of professional engineer association).

■ Defendants argue that under the rule of reason, plaintiffs have the burden to show some harm to competition in the relevant market. Proof of injury to themselves is not enough. For purposes of this motion, defendants accept plaintiffs' definition of the relevant market as the market in the United States for memberships in professional appraisal organizations. Plaintiffs' Memo in Opposition at 27–28.

Plaintiffs argue there is enough evidence of harm to competition in the relevant market to prevent summary judgment. Plaintiffs contend that appraisal organizations excluded from the Foundation have been unable to compete effectively. Their members demanded they join the Foundation because of its stature and control in the industry. Many members chose not to renew their memberships when the organizations were not allowed into the Foundation. Exclusion from the Foundation diminished the importance of appraisal designations [14] from organizations like NAREA and NARA/MU. According to plaintiffs, customers were reluctant to hire appraisers with designations from non-Foundation organizations. Such

---

**14.** Designations are titles such as "Certified Real Estate Appraiser" which the various appraisal organizations confer on individuals who meet stated criteria. The titles and criteria differ from one organization to the next. The prestige of any given designation is related to the reputation of the organization which bestows it and the difficulty of meeting the particular criteria.

designation preferences forced members of excluded organizations to look elsewhere in order to find work. NAREA and NARA/MU argue they and other organizations have experienced precipitous drops in membership since their unsuccessful applications to the Foundation.[15] Plaintiffs argue exclusion from the Foundation has resulted in lost revenues from membership dues, educational courses, and publications. They argue that while excluded groups have suffered losses and membership declines, the eight organizations that formed the Foundation have increased their market share from 66% in 1990 to 71% in 1992.

There is evidence in the record to suggest that some banks and savings and loan associations may have preferred appraisers holding designations with organizations that were members of the Foundation, and that this influenced some appraisers when deciding which organizations to join. *See, e.g.,* Plaintiffs' Exhibit 1700 and 1701. Plaintiffs argue that such preferences caused its membership to drop and harmed competition in the market for real estate appraisal organizations.

Under the rule of reason plaintiffs must show injury to competition in the relevant market. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Paschall v. Kansas City Star Co.,* 727 F.2d 692 (8th Cir.1984). In their amended complaint plaintiffs allege defendants have conspired and engaged in anticompetitive conduct "for the purpose and effect of foreclosing competition, limiting output, and enhancing prices in the relevant markets." Amended Complaint at ¶ 42. The complaint further alleges that:

the public at large is being injured in that, among other things, the output and supply of appraisal education and professional appraisal services are being restricted in a manner that will result in appraisal services of lower quality and higher cost.

*Id.* at ¶ 41.

While plaintiffs have experienced significant declines in membership, they have not produced evidence to show that the overall market for real estate appraiser organizations has been harmed. Plaintiffs have produced no evidence to show the quality of appraisal services has declined. Moreover, the record does not indicate any shortage in the supply of appraisal organizations or increased prices for memberships, educational programs, or publications. In fact, NAREA and NARA/MU themselves may have offered more educational courses in 1993 than 1992. Johnson Deposition at 697. Membership declines in individual organizations do not, by themselves, establish harm to the overall market. "A practice is not 'anticompetitive' simply because it harms competitors ... Rather, a practice is anticompetitive only if it harms the competitive process." *Town of Concord, MA v. Boston Edison, Co.,* 915 F.2d 17, 21 (1st Cir.1990) (citations omitted). Plaintiffs have not shown enhanced prices, a shortage of appraiser organizations, or other injury to competition in the relevant market. Because they cannot establish an essential element of their antitrust claims, injury to competition in the relevant market, summary judgment is appropriate. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Even if plaintiffs could show injury to the relevant market, they would also have to produce evidence that the alleged anticompetitive conduct was a material cause of such injury. Defendants argue that there are so many other reasons for plaintiffs' problems that a jury could not determine beyond mere speculation that exclusion from the Founda-

---

15. NARA/MU states its membership dropped from over 7,500 in 1990, to fewer than 3,000 in 1993. NAREA claims to have experienced a loss from over 20,000 members in 1990, to less than 10,000 in 1993. Plaintiffs argue these losses are even more dramatic in light of their rapid growth in memberships before 1990. NARA/MU claims to have grown from 6,375 members in 1988 to 7,438 in 1989, while NAREA grew from 13,430 to 20,145 members over the same period.

According to plaintiffs, other organizations not immediately admitted to the Foundation, such as the American Association of Certified Appraisers (AACA), and the National Association of Master Appraisers (NAMA), also lost members. AACA declined from 2,600 to 1,800 members, while NAMA shrunk from 7,000 members to 4,000. An AACA representative, however, has testified that he does not believe its membership decline was cause by lack of membership in the Foundation. *See,* p. 1417, *infra.*

tion was a material cause of plaintiffs' membership declines.

▪ Antitrust plaintiffs seeking treble damages "must establish an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." *Rosebrough Monument Company v. Memorial Park Cemetery Association,* 666 F.2d 1130, 1146 (8th Cir.1981) They "may not recover for losses due to factors other than the defendant's anticompetitive violations." *Amerinet, Inc. v. Xerox Corporation,* 972 F.2d 1483, 1494 (8th Cir.1992).

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts. *Bigelow* [*v. RKO Radio Pictures* ] 327 U.S. [251] at 264, 66 S.Ct. [574] at 579 [90 L.Ed. 652 (1946) ]. To allow otherwise would force a defendant to pay treble damages for conduct that was determined to be entirely lawful.

*Id.* (quoting *MCI Communications Corporation v. American Telephone and Telegraph Company,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983)).

▪ The present case resembles the situation in *Amerinet.* Although Amerinet argued its loss of sales were due to alleged anticompetitive actions of Xerox, there was evidence in the record that its business had suffered from increased competition and that it lacked experience in the field of used laser printer sales. *Amerinet,* 972 F.2d at 1491. Amerinet had also been substantially hurt in 1986 and 1987 by actions of some former employees later sued for misappropriation of trade secrets, neglect of duty, and unfair competition. *Id.* Summary judgment was proper because Amerinet "had not distinguished its alleged antitrust injury from other evidenced injury it sustained in 1986–87, or shown the requisite causal connection between the defendant's alleged anticompetitive violation and [its] injury ..." *Id.* at 1496.

A similar situation existed in *Greater Rockford Energy & Technology, et. al. v. Shell Oil,* 998 F.2d 391, 404 (7th Cir.1993). In that case ethanol producers sued several oil companies alleging that they had attempted to eliminate competition in the motor fuel market by discriminating against and disparaging ethanol and other alcohol blended fuels. *Id.* at 393. Summary judgment was upheld because plaintiffs failed to "establish with a fair degree of certainty that the [antitrust] injury was a material element of, and substantial factor in producing the injury." *Id.* at 401. Plaintiffs failed to distinguish between the alleged antitrust injury and the harm to ethanol sales caused by such things as warnings in automobile owner manuals, media criticism in publications such as *Consumer Reports,* state laws requiring labeling of pumps containing ethanol, and various reductions in state tax exemptions and subsidies to the ethanol industry. *Id.* at 402–404. The court concluded that while "[s]tanding alone" any one of the alternative causes may have been insufficient, "[t]aken together" they showed plaintiffs could not prove causation and summary judgment was appropriate. *Id.* at 404.

Here there is evidence of many other factors which have adversely impacted plaintiffs over the last several years. NAREA and NARA/MU have been involved in litigation that has damaged their reputation and membership base. In one case, *NAREA v. Roy C. Schaeffer,* C.A. No. 89–0225 T (D.R.I. 1989), NAREA sued Schaeffer for defamation because he publicly called NAREA a "diploma mill" after it had admitted his cat Tobias as a designated member. NAREA submitted affidavits in that case stating that Schaeffer's comments had caused a dramatic drop in its membership renewal rate. After a two day bench trial, the district court determined there was no defamation because Schaeffer's characterization of NAREA as a diploma mill was essentially true. Defendants' Exhibit 17 at 12. The court found NAREA's admission process:

> consisted of a five minute review of the application form. It was accompanied by no independent investigation or verification of the applicant's background, experience,

character or ability or even any inquiry into whether the applicant was licensed, no resume or sample appraisal was required apparently at that time or if they were Tobias' failure to submit them were ignored.

*Id.* at 11.

The negative effect of the so-called cat case was magnified when it was specifically mentioned in the 1990 House Government Operations Committee status report regarding the appraisal reform amendments of FIRREA. After discussing the need for the Foundation to admit all qualified appraiser organizations as members, the committee noted:

> The committee does not intend in any way to suggest that membership should be available to such groups as the National Association of Real Estate Appraisers and its related organizations which are based in Scottsdale, AZ. In adjudicating a defamation case in which these organizations were plaintiffs, a U.S. District Court held in finding for the defendant that statements that the organizations were a "diploma or certification mill" were not defamatory because they were essentially true.

H.R.Rep. No. 981, 101st Cong., 2d Sess. 1, 7 n. 1 (1990) (Defendants' Exhibit 18). NAREA and NARA/MU President Ken Twitchell conceded in deposition testimony in this case that the cat case continues to damage plaintiffs to the present day and has caused them to lose members, made it more difficult to attract new members, and damaged the overall credibility of the organizations. Twitchell Deposition at 206–208.

Plaintiffs have also claimed substantial damage from another source in a lawsuit NAREA initiated against the State of Washington. In that action NAREA claimed that Washington's designation of its state-licensed appraisers as "State–Certified Real Estate Appraisers" misappropriated NAREA's "Certified Real Estate Appraiser" designation, to which it claimed common law trade-

mark rights. Robert Johnson submitted an affidavit in that case stating that NAREA lost members because of the legislation.

Defendants urge that plaintiffs' reputation has also been affected by the fact they have been investigated by both the Department of Labor and the Federal Elections Commission (FEC). The FEC investigated plaintiffs concerning illegal contributions to the presidential campaign in 1988. Robert Johnson and Kenneth Twitchell eventually pleaded guilty to criminal charges arising out of the investigation.[16] The Department of Labor investigation involved inquiry into the failure of IAM (the corporation which manages NAREA and NARA/MU) to account for and pay overtime to certain former employees. The inquiry resulted in the Department filing a lawsuit to collect the unpaid monies.

In addition, defendants argue the market for appraiser organizations has also been affected by a slow real estate economy in recent years and that changes in state certification and licensing requirements have diminished the importance of designations from private organizations. For example, AACA representative Sol Sherman testified at his deposition that membership declines in his organization prior to being admitted to the Foundation were not caused by not being in the Foundation, but were "a sign of the times". Sherman Deposition at 45–46. According to Sherman, factors such as retirements and state testing requirements adversely impacted memberships. *Id.* Plaintiffs' contention that their own memberships declined because they were excluded from the Foundation is contradicted by Sherman's testimony that AACA would probably have more members today if it were not in the Foundation, because it could accept anybody. *Id.* at 69–70. Sherman says ACAA has a smaller, but higher caliber membership because of Foundation membership requirements. *Id.*

Summary judgment is appropriate against a party "who fails to make a showing suffi-

---

**16.** In June 1993 Robert Johnson pleaded guilty to one count of perjury and one count of making illegal campaign contributions through NAREA. *See*, Exhibits 3 and 4, Supplemental Affidavit of Kathleen Sheehy (submitted in connection with

Plaintiff's objections to Magistrate Judge Franklin Noel's Order dated April 5, 1993). Also in June 1993 Kenneth Twitchell pleaded guilty to one count of obstructing a FEC inquiry. *Id.*

cient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence must be sufficient to raise a question for the jury which could be decided in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).. Here there is a wealth of evidence showing a number of adverse factors affecting plaintiffs other than the alleged anticompetitive conduct. Plaintiffs have failed to distinguish the alleged antitrust injury from other injury it has sustained and have not shown a causal connection between defendants' alleged anticompetitive conduct and their injuries. Standing alone, any of these other factors would be insufficient to justify summary judgment, but taken together, they indicate the element of causation cannot be proven. *Greater Rockford Energy & Technology, et al. v. Shell Oil,* 998 F.2d 391, 404 (7th Cir.1993). Plaintiffs' failure to establish the necessary causation is a second and independent basis why summary judgment should be granted on plaintiffs' antitrust claims.

■ To prevail on their antitrust claims plaintiffs must also show concerted antitrust action. A "conglomeration of two or more legally distinct entities cannot conspire among themselves if they pursue the common interests of the whole rather than interests separate from those of the group itself". *City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, Inc.,* 838 F.2d 268, 274 (8th Cir.1988) (quoting *Copperweld v. Independence Tube Corporation,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (finding a corporation and its wholly owned subsidiary could not conspire under the antitrust laws)). In *Mt. Pleasant* a rural power cooperative was found not to have conspired because none of the individual companies had pursued interests divergent from the cooperative's. *Id.* at 276–77. The economic power of the cooperative members was increased by virtue of their participation in the cooperative. *Id.* at 276. While the cooperative members had diverse interests on some issues, because of their interdependence, the disagreements were "more like those among the board members of a single enterprise, than those among enterprises which are themselves separate and independent." *Id.* at 277.

■ The same interdependence and common purpose exists in the Foundation. The members are interdependent because the Foundation derives its influence from representing the entire appraisal industry. The purpose of the Foundation is to "establish and improve appraisal standards" and to "establish appropriate criteria for the certification and recertification of qualified appraisers". *See,* Foundation Bylaws, Article III. The Foundation members have a common purpose because the economic interest of the entire appraisal industry is furthered by the standards and certifications developed through the ASB and AQB set up by the Foundation. The pro-competitive purpose of the Foundation is evidenced by the fact that Congress in FIRREA adopted the standards set by the ASB and AQB.

Because the Foundation is a single enterprise pursuing the common goal of establishing standards and ethics in the appraisal industry, the burden is on plaintiffs "to show specific facts which present a triable issue of fact as to whether any of the defendants has pursued interests diverse from those of the [Foundation] itself." *Mt. Pleasant,* 838 F.2d at 276. Contact between professional associations on industry issues is not inherently suspect and courts generally:

> will not infer a conspiracy to violate the antitrust laws based on a showing of regular contact between two independent professional associations on general matters of mutual interest and concern. This is the very purpose and nature of professional associations and this court will erect no barriers to accomplishment of this absent much more substantial evidence of conspiracy to restrain trade than that adduced here.

*Machovec et al. v. Council for National Register of Health Service Providers in Psychology, Inc.,* 616 F.Supp. 258, 268 (D.Va.1985) (quoting *Kreuzer v. American Academy of*

*Periodontology,* 735 F.2d 1479, 1488–89 (D.C.Cir.1984)).

Summary judgment was granted in both *Machovec* and *Kreuzer* because no conspiracy was established between professional organizations. The *Machovec* plaintiffs claimed the American Psychological Association (APA) and the Council for the National Register of Health Service Providers in Psychology, Inc. (Council) conspired to prevent them from being listed in a national register of psychologists. *Machovec,* 616 F.Supp. at 260. Defendants asserted plaintiffs did not meet the required criteria. *Id.* at 261–62. Plaintiffs' Section 1 claims were dismissed on summary judgment because they could not show that each defendant had a "conscious commitment to a common scheme designed to achieve an unlawful objective". *Id.* at 267 (quoting *Monsanto Co. v. Spray–Rite Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984)). Plaintiffs were required to "prove 'concerted action' not mere guilt by association." *Id.* at 268. Likewise in *Kreuzer* no conspiracy was shown between the American Dental Association and the American Academy of Periodontology (AAP), and summary judgment was granted on antitrust claims alleging they conspired to deny plaintiff AAP membership. *Kreuzer,* 735 F.2d at 1488.

Plaintiffs in this case have not produced evidence to show that the individual sponsors have acted contrary to the stated purposes of the Foundation or that there exists a "conscious commitment to a common scheme designed to achieve an unlawful objective". *Machovec,* 616 F.Supp. at 266. There has also been no showing of injury to competition in the relevant market. The antitrust laws were not designed to prevent contact between professional organizations regarding areas of industry concern. *Kreuzer,* 735 F.2d at 1488. Summary judgment is warranted in light of plaintiffs' failure to show the concerted activity and anticompetitive intent necessary for their antitrust claims.

### IV.

Defendants also seek summary judgment on plaintiffs' tortious interference claims. Plaintiffs allege that defendants' conduct:

constitutes tortious interference with [plaintiffs'] contractual and business relations, prospective contractual and business relations, and economic advantage, by reason of which [plaintiffs] [have] been injured in [their] business and property and [continue] to suffer such injury …

Amended Complaint ¶ 44. The allegations do not elaborate further on the exact contracts or relations allegedly interfered with, but refer generally to their declines in membership. They allege they have lost members, membership dues, tuition and fees from educational courses, and the like. Amended Complaint ¶ 40.

To establish tortious interference plaintiffs must produce evidence that defendants intentionally and wrongfully interfered with plaintiffs' existing and prospective contractual relationships with their members, and that but for defendants' actions, plaintiffs would have received the benefits of those contractual relationships. *See, United Wild Rice v. Nelson,* 313 N.W.2d 628 (Minn.1982); *Amerinet,* 972 F.2d at 1508 (citing *Jackson v. Reiling,* 311 Minn. 562, 249 N.W.2d 896, 897 (1977)).

Plaintiffs apparently believe that defendants have intentionally interfered with their relationships with members and prospective members through their alleged anticompetitive conduct. As previously discussed, however, there has been no showing of harm to competition, and plaintiffs have failed to show concerted anticompetitive activity.

Moreover, plaintiffs have not shown they would have benefited from the member relationships but for the actions of defendants. Tortious interference requires an even stronger showing of causation than antitrust claims, since plaintiffs must show that the injury would not have occurred but for the wrongful conduct. *Amerinet,* 972 F.2d at 1508 (citing *Jackson v. Reiling,* 311 Minn. 562, 249 N.W.2d 896, 897 (1977)). In light of their many other problems revealed in the record, plaintiffs cannot show that they would have retained their members and attracted new ones if it were not for defendants' refusal to admit them as an Appraisal

Sponsor. Furthermore, plaintiffs claim that only participation in the Foundation as Appraisal Sponsors would have prevented their membership losses, but they have made no factual showing that they have attempted to participate in the Foundation through other avenues open to organizations who do not meet all criteria for Appraisal Sponsors, that such participation was foreclosed, or that it would have had no beneficial value for their members.

Since plaintiffs have failed to present evidence sufficient to create genuine issues of fact on the issues of intentional interference and but for causation, defendants' motion for summary judgment on the tortious interference claims should be granted.

## V.

After discussing case management issues with counsel, it was decided that all dispositive motions in the transferee trustee cases had to be brought by October 2, 1993, except for motions which could not be brought until disposition of the claims in the original cases. Management Order No. 1, August 2, 1993. Since summary judgment will be entered in the original cases, a deadline now needs to be set for the bringing of any motions which fall within the excepted category. Any such dispositive motions in the individual trustee cases should be filed with supporting memoranda by June 27, 1994, with responsive memoranda due by July 29, 1994. After receipt of any such memoranda, the court will decide whether oral argument should be scheduled. If no such motions are filed by the deadline, the court will assume the transferee cases should be remanded to the transferor districts for trial.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1) the motion for summary judgment of the Foundation, the National Society of Real Estate Appraisers (NSREA), the American Society of Appraisers (ASA), and the Appraisal Institute is granted, and all claims and counterclaims in Civ. Nos. 4–

91–294 and 4–92–620 are dismissed with prejudice; and

2) any permissible dispositive motions in Civ. Nos. 4–93–573, 4–93–574, and 4–93–575, shall be filed by June 27, 1994.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**