**DYNO NOBEL, INC., Plaintiff,**

v.

**AMOTECH CORPORATION, et al., Defendants/Third– Party Plaintiffs,**

v.

**Drillex, S.E., et al., Third– Party Defendants.**

**Civil No. 95–2475(SEC).**

United States District Court, D. Puerto Rico.

July 1, 1999.

---

Raymond J. Etcheverry, Mark A. Glick, David M. Bennion, Parsons, Behle & Latimer, Salt Lake City, UT, Francisco A. Besosa, Eduardo A. Santiago–Acevedo, Axtmayer, Adsuar, Muñiz & Goyco, San Juan, PR, for plaintiff.

Francisco J. Criado, San Juan, PR, for third–party defendants.

Edilbeto Berrios–Pérez, Hato Rey, PR, for defendants–third party plaintiffs.

## Collection of Monies/Antitrust

CASELLAS, District Judge.

### OPINION AND ORDER

Pending before the Court are several motions for summary judgment filed by Dyno Nobel, Inc. ("Dyno") **(Docket # 94, 93)** and third-party defendants Drillex, S.E., Jose F. Criado Vázquez, his wife Pilar Valladares de Criado and their conjugal partnership. (hereinafter "Drillex") **(Docket # 94)**. Dyno and Drillex seek dismissal of the antitrust, Law 75 and tortious contractual interference claims filed by Amotech Corporation, Rey Francisco Rivera, Jr, his wife Ada Luz Collazo, and their conjugal partnership (hereinafter "Amotech"). Amotech filed its opposition on June 4 and June 7, 1999, more than a month after the April 25 deadline prescribed by the Court. For the reasons stated below in this Opinion and Order, the motions for summary judgment filed by Dyno and Drillex are **GRANTED.**

### Summary Judgment Standard

The First Circuit Court of Appeals has explained that summary judgment "is a means of determining whether a trial is actually required. It is appropriately granted when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Thus, in order to defeat a properly crafted summary judgment motion, the party opposing it must demonstrate that a trialworthy issue looms as to a fact which could potentially affect the outcome of the suit." *Serapión v. Martinez,* 119 F.3d 982 (1st Cir.1997). *See also McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

In determining whether to grant a summary judgment, the Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines,* 42 F.3d at 684.

The mere existence of a factual dispute is not, however, enough to defeat summary judgment. *United Structures of America, Inc. v. G.R.G. Engineering, S.E.,* 927 F.Supp. 556, 560 (D.P.R.1996). In those cases where there are factual disputes, summary judgment will be deemed proper if the unresolved facts are not genuine and material to the resolution of the case. *Corporación Insular de Seguros v. Reyes Muñoz,* 849 F.Supp. 126, 132 (D.P.R.1994). For a dispute to be "genuine", "the factual controversy 'must be sufficiently open-ended to permit a rational factfinder to re-

solve the issue in favor of either side'." *Lynne Woods–Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 124 F.3d 47 (1st Cir. 1997). *See also U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

Recent case law has established that "summary judgment may be appropriate '[e]ven in cases where elusive concepts such as motive or intent are at issue ... if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation.'" *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994) (quoting *Medina–Muñoz v. R.J. Reynolds Tobacco, Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

It thus seems that, at least as long as it is "the nonmovant [that] bears the ultimate burden of proof at trial, he [will] not [be able to] defeat a motion for summary judgment by relying upon evidence that is 'merely colorable' or 'not significantly probative.'" *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993), *referring to Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "To the contrary, the nonmovant [will have to] 'present definite, competent evidence to rebut the motion.'" *Pagano*, 983 F.2d at 347, *referring to Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

**Factual Background**

Dyno, a corporation organized under the laws of Delaware, formerly known as IRECO Incorporated, specializes in the manufacture and sale of explosives and explosives-related products. Amotech is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Toa Baja,

Puerto Rico, that specializes in the distribution and sale of explosives and is also a drilling and blasting contractor. On or about December 3, 1991, Dyno and Amotech Corporation ("Amotech") entered into a distribution agreement (the "Agreement") whereby Amotech would promote and sell Dyno products in Puerto Rico, Virgin Islands and other Caribbean Islands. Complaint, ¶ 18; Amotech, Agreement, ¶ 1.A.

The Agreement, according to Dyno, was not exclusive and would only become so for the Puerto Rico area if Amotech obtained 25% of the Puerto Rico market within the first year of the agreement. Agreement, Exhibit 3 of the Complaint, ¶ 1.A. Dyno alleges that the Agreement was never meant to be or become exclusive for the Virgin Islands and other Caribbean Islands. (Docket # 38 Unsworn Declaration of Richard Shea Under Penalty of Perjury, ¶ 10, DYNO's Corporate Counsel, Exhibit 1 (hereinafter "Shea Declaration")).

On or about April 1, 1992, at DYNO's request, Mr. Rey Rivera, Amotech's President[1] and owner of 30% interest in the company (Complaint, ¶ 15, Deposition of Rey Francisco Rivera Jr., Exhibit 2, p. 16, "Rivera Deposition") executed a guaranty agreement (the "Guaranty") pursuant to which Rivera, individually and in his personal capacity, jointly and severally with Amotech, guaranteed the full and complete payment of "[a]ll sums owing, and to become owing upon any and all sales of goods" sold to Amotech by DYNO; and "[a]ll attorneys' fees, court costs and other costs and expenses incurred by [Amotech] in connection with collection of such Debt ..." (Complaint, ¶ 21; Rivera's Guaranty, Exhibit 5 of the Complaint.) Upon the execution of the Guaranty and upon Amotech's compliance of several additional terms and conditions, DYNO and Amotech continued doing business in the regular course of their Agreement. Complaint, ¶ 20, Amotech's Answer, ¶ 20.

---

1. In his taking of deposition Mr. Rivera noted that at the time he subscribed the Guaranty

he was serving as Amotech's Vice-president. (Rivera Deposition, Exhibit 2, p. 13)

From September 30, 1994 to September 30, 1995, DYNO sold Amotech goods on credit. Upon Amotech's failure to pay for these goods, Dyno filed the present complaint on December 1, 1995. On March 11, 1996, Amotech and Rivera filed an answer and a counterclaim alleging several violations by Dyno under the Puerto Rico's Dealers Act (Law 75). On February 20, 1997, Amotech filed an amended counterclaim and a third-party complaint against Drillex, S.E., Jose Fernando Criado Vázquez, his wife Pilar Valladares de Criado and the conjugal partnership formed by them.

The third-party complaint alleged, in essence, that Drillex conspired with Dyno to control the market of explosives in Puerto Rico. Amotech claims that Dyno sold explosive materials to Drillex at a lower price than it had charged Amotech for the same materials. This alleged price discrimination, claims Amotech, substantially lessened competition and undermined Amotech's market share in the Puerto Rico "explosives material" market. Thus, Amotech claims damages under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 15(a) and the Robinson–Patman Act, 15 U.S.C. § 13(a).

On March 27, 1998, this Court granted Dyno's unopposed motion for partial summary judgment against Amotech and ordered Amotech to pay Dyno the amount of $176,455.34, plus accrued interest, costs, and attorneys' fees incurred in the collection of the debt. (**Docket # 84**) Amotech's claims pursuant to Law 75 and antitrust laws and its contractual interference claim are the focus of the pending summary judgment motions. However, before we decide the parties' contentions on the merits, we must discuss Dyno and Drillex's allegations regarding Amotech's delayed filing of its opposition to the pending summary judgment motions. (**Dockets # 99, 100, 101, 103, 104**)

Dyno and Drillex filed their respective summary judgment motions on March 15, 1999. (**Dockets # 93, 94**) On April 8, 1999, Amotech requested and this Court granted an extension of time to file its opposition **until April 24, 1999**. This Court noted on its margin order of April 12, 1999 that **"no further extensions of time shall be granted."** (**Docket # 96**). On April 26, 1999, notwithstanding this Court's order against further extensions, Amotech requested another extension of time to file a reply until May 20, 1999, which the Court did not grant. (**Docket # 98**) Dyno and Drillex both objected to Amotech's petition and requested sanctions and the entry of summary judgment against Amotech. (**Dockets # 99–101**). On June 1, 1999, Amotech requested another extension of time to reply until June 4, 1999, which the Court did not grant, claiming 1) that many of the depositions were in Spanish and Amotech's United States counsel could not understand them, 2) that Drillex withheld relevant documents from Amotech, and 3) that Amotech received the summary judgment motions "well after March 15th, the date that the papers were certified as being mailed." This was the first time that Amotech recited this litany of reasons to request an extension. (**Docket # 102**) Amotech filed its opposition on the Law 75 claims on June 7, 1999, 3 days after its self-imposed deadline. (**Docket # 106**)

■ In view of the procedural history described above, the Court would be shirking its duty to "secure the just, speedy, and inexpensive determination of every action" if it allowed Amotech to flaunt this Court's orders with impunity. See Fed. R.Civ.P. 1. This Court would be hard-pressed to find another case where it would feel more justly entitled to "close the gates to the Courthouse." [2] The First

---

**2.** We note that every party has a right to timely oppose a motion for summary judgment. In *Delgado–Biaggi v. Air Transport Local 501,* 112 F.3d 565 (1st Cir.1997), the

Court of Appeals reversed the district court's grant of summary judgment, since the judge failed to give the opposing party the opportunity to file within the 10–day period pre-

Circuit has repeatedly stressed the need for district court judges to keep a tight rein over its proceedings in discovery and pretrial matters. In *Legault v. Zambarano*, 105 F.3d 24 (1st Cir.1997), the Court described the Court's duty to sanction those parties that repeatedly fail to comply with a trial judge's pre-trial orders:

> A challenge to a trial judge's exercise of discretion in these circumstances carries an especially heavy burden. Over twenty years ago the Supreme Court sharply underlined the importance of supporting a trial court's decisions concerning sanctions, even where the judge imposed the most stringent sanction, outright dismissal, for misconduct in the pretrial phase of a case. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) ... This circuit's decisions have been entirely consistent with the Supreme Court's directive. *See, e.g. Spiller v. U.S.V. Laboratories, Inc.*, 842 F.2d 535, 537 (1st Cir.1988) *Damiani v. Rhode Island Hosp.*, 704 F.2d 12, 17 (1st Cir.1983).

*Id.* at 26.

The First Circuit continued:

> The extent to which a party's failure to file pretrial papers in a timely manner puts an opponent into an unfair position, by causing unnecessary preparation, confusion or distraction, and the translation of this unfairness into a sum of money, are tasks that must be left except in the most extraordinary circumstances to the good sense of the judge

on the scene. Beyond this the trial judge has an independent responsibility to enforce the directives he has laid down for the case. This court has made this point before in the clearest terms. "Rules are rules—and the parties must play by them. In the final analysis, the judicial process depends heavily on the judge's credibility. To ensure such credibility, a district judge must often be firm in managing crowded dockets and demanding adherence to announced deadlines. If he or she sets a reasonable due date, parties should not be allowed casually to flout it or painlessly to escape the foreseeable consequences of noncompliance."

*Id.* at 28–29. (Citing *Méndez v. Banco Popular de Puerto Rico*, 900 F.2d 4, 7 (1st Cir.1990)).

 Just as Amotech ignored the Court's admonition of April 12, 1999 that "no further extensions of time shall be granted," this Court shall ignore Amotech's belated opposition for summary judgment. Accordingly, the Court **orders** the Clerk of the Court to **strike from the record** Amotech's motion in opposition to summary judgment. **(Docket # 106)** Amotech, in failing to timely oppose the motion for summary judgment, has also failed to comply in a timely manner with the so-called "anti-ferret rule"; that is, they have not presented a concise statement of material facts as to which there is a genuine issue to be tried, as required by Local Rule 311.12.[3]

---

scribed by Fed.R.Civ.P. 56(c). The Court noted: "[S]ummary judgment targets should be secure in the knowledge that they will have at least ten days in which to formulate and prepare their best opposition." Id. at 567. In the present case, Amotech had over a month to prepare its opposition and yet was unable to comply with the Court's generous extension of time.

**3.** Local Rule 311.12 provides that:

[u]pon any motion for summary judgment, there shall be served and filed annexed to the motion a separate, short, and concise statement of the material facts as to which

the moving party contends there is no genuine issue to be tried and the basis of such contention as to each material fact, properly supported by specific reference to the record. All material facts set forth in the statement required to be served by the moving party shall be deemed to be admitted unless controverted by the statement required to be served by the opposing party. The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, properly supported by specific reference to the record.

This Court has previously expressed that "[w]hen a party opposing a motion for summary judgment fails to comply with [the foregoing] 'anti-ferret rule,' the statement of material facts filed by the party seeking summary judgment [shall be] deemed . . . admitted." *Méndez–Marrero v. Toledo,* 968 F.Supp. 27 (D.P.R.1997), *referring to Domínguez v. Eli Lilly & Co.,* 958 F.Supp. 721, 727 (D.P.R.1997). *See also Tavarez v. Champion Products, Inc.,* 903 F.Supp. 268, 270 (D.P.R.1995).

Otherwise, the Court would be forced to search "through the entire record for evidence of genuine issues of material fact which might preclude the entry of summary judgment." *Méndez–Marrero,* 968 F.Supp. at 34, *referring to Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 930–31 (1st Cir.1983). Although the non-movant's failure to provide a statement of uncontested material facts does not automatically warrant the granting of summary judgment, "it launches the non-movant's case down the road towards an easy dismissal." *Id.*

Such is the scenario in the present case. Because defendants have failed to timely oppose the present motion, they have violated the anti-ferret rule. Accordingly, all material facts set forth in defendant's statement of undisputed material facts shall be deemed admitted. *Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814, 816 n. 2 (1st Cir.1991); *Laracuente v. Chase Manhattan Bank,* 891 F.2d 17, 19 (1st Cir.1989). Thus, we need only examine whether given the facts, Dyno and Drillex are entitled to judgment as a matter of law.

### Applicable Law/Analysis

### Amotech's Price Discrimination Claim Fails to Comply with the Required Elements of a Claim under the Robinson–Patman Act

Amotech claims that from the period of October 1994 through February 1996, Dyno began to sell explosives material to Drillex, specifically "blasting caps," at a substantially lower price than it sold "blasting caps" to Amotech. Amotech alleges that Dyno never offered it the same below-market prices that Dyno offered to Drillex. As a result of Dyno's refusal to make a similar offer, Amotech contends that it was forced to buy its supplies from Dyno at a price six times higher than the price offered to Drillex. This price discrimination between Drillex and Amotech, argues Amotech, substantially affected its ability to compete in the "explosives material market" with Drillex, and caused irreparable economic injury to Amotech, all in violation of the Robinson–Patman Act.

Section 2(a) of the Clayton Act, as amended in 1936 by the Robinson–Patman Act, 15 U.S.C. Section 13(a), reads, in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities **of like grade and quality,** where either or any of the purchases involved in such discrimination are in commerce, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. . . . (Emphasis added)

■ Upon review of the allegations and the pertinent evidence before us, we find that Amotech fails to comply with the required criteria to establish a Robinson–Patman claim. In order to prevail under this claim, Amotech must show: 1) a cognizable difference in price; 2) between two buyers purchasing contemporaneously from the same seller; 3) involving commodities; 4) of like grade and quality; 5) that may injure competition. 15 U.S.C. § 13(a). *Federal Trade Commission v. Borden Co.,* 383 U.S. 637, 643, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966).

■ Although Amotech claims that there was a cognizable difference in the price of the blasting caps sold to Drillex and Amotech and that Drillex and Amotech purchased commodities from Dyno during the same period, Amotech has failed to present evidence to suggest that the "blasting caps" sold to Dyno and Amotech were "of like grade and quality" and that the price distinction from the sales directly caused the erosion of Amotech's market share in the "explosives material" market.

In the present case, the blasting caps put on the "blue light" list by Dyno are vastly different in quality, physical characteristics and value, compared to the new caps. It is undisputed that the blasting caps sold to Amotech were new, while the blue light caps sold to Drillex were old, obsolete or approaching the end of their shelf lives. (Docket # 94, Dyno's Statement of Undisputed Facts # 3 (hereinafter "Dyno's Undisputed Facts")) An essential feature of a blasting cap is its ability to set off explosives with exact timing. As noted by Dyno's expert, as blasting caps age, their timing ability deteriorates. (Dyno's Undisputed Facts # 6, Deposition of Robert Taylor, p. 31) In view of the record presented before us, we agree with Dyno's contention that the "blue light" caps sold to Drillex were substantially different in grade and quality from the caps sold to Amotech and thus cannot be used to show price discrimination pursuant to the Robinson–Patman Act. Accordingly, Amotech's claim under the Robinson–Patman Act is **DISMISSED.**

**Amotech has Failed to Establish the Required Elements of a Claim under Sections 1 and 2 of the Sherman Act.**

 a. § 1 of the Sherman Act for Conspiracy

Section 1 of the Sherman Act reads as follows:

 1. **Trusts, etc., in restraint of trade illegal; penalty**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

■ A plaintiff must prove three elements to recover under Section 1 of the Sherman Act, to wit: (1) a contract, combination or conspiracy among two or more independent actors; (2) that unreasonably restrains trade; and (3) is in, or substantially affects, interstate or foreign commerce. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)

Amotech claims that Dyno and Drillex conspired to undermine Amotech's market share in the "explosives material" market through a price-discrimination scheme. Amotech alleges that Dyno agreed to sell, and Drillex agreed to buy, explosives material, which included the "blasting caps", at a substantially lower price than the price Dyno would offer to Amotech. Such scheme, notes Amotech, constituted a conspiracy which curtailed Amotech's ability to compete with Drillex and led to a precipitous decline in Amotech's market share in the "explosives material" market. Amotech thus notes that the above described scheme violated Sections 1 and 2 of the Sherman Act. (Amended Counterclaim, par. 10–12)

■ To establish a conspiracy claim under Section 1 of the Sherman Act, a plaintiff must prove the existence of a "meeting of the minds" or "an agreement" to carry out an unlawful scheme. *Monsanto Co. v.*

*Spray–Rite Service Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Absent direct evidence of an agreement, the plaintiff bears the burden of showing that circumstantial evidence raises a legal inference of conspiracy. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court explained that "antitrust law limits the range of permissible inferences from ambiguous evidence in a Section 1 case. Thus, ... conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy ... To survive a motion for summary judgment ..., a plaintiff ... must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."

The *Matsushita* Court identified two separate inquiries critical to an antitrust plaintiff's burden of demonstrating an inference of conspiracy: first, whether the conspiracy is economically plausible, and second, whether the defendant's conduct "was consistent with the defendant's independent interest." Id. at 587, 106 S.Ct. 1348. Where the inferences of conspiracy are no stronger than the competing inferences of independent action, the plaintiff has not sustained its burden of proof, and the claim must be dismissed Id. at 596–97, 106 S.Ct. 1348; *see also Computer Identics Corp. v. Southern Pacific Co.,* 756 F.2d 200, 203 (1st Cir.1985) (dismissing antitrust claim where plaintiff failed to produce evidence that would tend to "exclude the possibility that [the defendants] were acting independently." (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464))

It is clear from the record that there is no direct evidence that Dyno and Drillex had a "meeting of the minds" to intentionally undermine Amotech's competitiveness in the market. Although representatives of Dyno and Drillex met in January 1994 to conduct business, such meeting, without more, does not create an inference of con-spiracy as defined by the Sherman Act. *See Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. at 762, 104 S.Ct. 1464. ("A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market.") Furthermore, the persons involved in the meeting of January 1994 testified that they did not discuss, and much less agreed, to any scheme or plan designed to undermine Amotech's position in the market. (Docket # 94, Dyno's Undisputed Facts, Exhibit 8, Deposition of Raymond Delon Hunsaker, p. 157, ln 17–19; Exhibit 9, Deposition of Hardin Dean Mitchell, p. 81, ln. 9–25., Exhibit 6, Deposition of José Criado Vázquez)

■ Lacking such direct evidence of conspiracy, Amotech also fails to show that the inference of conspiracy is reasonable in light of the competing inferences of independent action. *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348. The meeting between Dyno and Drillex, as noted above, does not create a reasonable inference of conspiracy in the present case; the fact that Dyno stopped selling to Amotech due to its poor payment record also fails to establish an inference of conspiracy. *See Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 860 (5th Cir.1981) ("Poor credit may constitute a defendant's proof that the refusal to deal was a unilateral rather than conspiratorial decision").

■ Amotech's claim that Dyno would not sell it bagged ammonium nitrate ("AN") also fails to raise an inference of conspiracy. Dyno stopped selling bagged AN not only to Amotech but to all its other customers, since it could no longer obtain the product from Arcadian, who later discontinued sales of the product. (Docket # 94, Dyno's Undisputed Facts, Exhibit # 12, Deposition of Robert Taylor, p. 69–70, ln. 3–25). Practices that affect all distributors cannot satisfy conspiracy requirements. *See Schaben v. Samuel Moore & Co.,* 606 F.2d 831, 834 (8th Cir. 1979) Furthermore, Amotech's allegation

that Dyno's lawsuit for collection of a debt is a "sham" designed to cover up anticompetitive practices is without merit. This Court has already granted summary judgment in favor of Dyno's collection claim. (**Docket # 85**) Since Amotech has failed to establish that the lawsuit is objectively baseless, its argument must fail. *See Professional Real Estate Investors v. Columbia Pictures,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

 Finally, Amotech cannot properly contend that Dyno's alleged conspiracy with Drillex was consistent with Dyno's independent interests. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. As noted by Dyno, it would not have been in its best economic interest to substantially undermine Amotech's market share and eliminate it as Drillex's competitor. Although the elimination of Amotech may benefit Drillex, Dyno's financial interest in Puerto Rico would be harmed if Drillex became the sole distributor of explosives. Dyno argues, and this Court agrees, that Dyno's business interests are best served by selling to competing distributors, not to a powerful monopoly. The First Circuit Court of Appeals has explained that "[o]ther things being equal, a profit-maximizing dealer monopolist would set retail prices that, from the supplier's perspective, are too high and unduly restrict the product's sales." *Monahan's Marine, Inc. v. Boston Whaler, Inc.,* 866 F.2d 525, 528 (1st Cir. 1989).

Simply put, if Drillex eliminated Amotech as a dealer, it would harm Dyno. In the absence of competition, Drillex could raise prices and reduce output leading to diminished demand for Dyno's products. *See* Areeda and Turner, *Antitrust Law* sec. 402 (ordinarily manufacturers will maximize their profits by encouraging maximum competition among dealers and low retail profit margins). Furthermore, if Drillex became a monopoly, it would substantially strengthen its bargaining position with Dyno. Thus, Drillex could demand concessions from Dyno that would

be unachievable if it faced competitors. See Robert Bork, *The Antitrust Paradox,* at 290 ("The manufacturer shares with the consumer the desire to have distribution done at the lowest possible cost …"); Viscusi, Vernon and Harrington, *Economics of Regulation and Antitrust* at 243 (dealer monopoly "would not be in supplier's best interest.")

Having failed to establish the "conspiracy" element required under Section 1 of the Sherman Act, this Court will not delve into the other elements of the claim. Pursuant to the previous analysis, Amotech's claim under Section 1 of the Sherman Act against Dyno and Drillex is **DISMISSED**.

## b. Section 2 of the Sherman Act for Monopoly or Attempt to Monopolize

Section 2 of the Sherman Act reads as follows:

### 2. Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

Amotech's monopoly claim against Dyno is improper, since Dyno does not have any market share in the relevant market, that is, "the market for the commercial explosive industry and explosives-related products in Puerto Rico." (Complaint, par. 9). *See Gilbuilt Homes, Inc. v. Continental Homes,* 667 F.2d 209, 211 (1st Cir.1981); *Pastore v. Bell Telephone Company of Pennsylvania,* 24 F.3d 508, 513 (3rd Cir. 1994) (share of the relevant market most

significant element to determine monopolization)

 As cogently noted by Dyno's counsel, Amotech's Section 2 claim suffers the same infirmities as its Section 1 claim under the Sherman Act. The key elements of a "conspiracy to monopolize" offense are: 1) the existence of a conspiracy; 2) an overt act in furtherance of the conspiracy; and 3) specific intent to monopolize. *United States v. Yellow Cab Co.*, 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Under Section 2 of the Sherman Act, plaintiff's burden of proof for claims of conspiracy to monopolize is higher than that required for Section 1 conspiracy claims. *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573–75 (11th Cir. 1991). Amotech must show not only evidence of concerted action but also a shared intent to monopolize the market. As previously discussed by the Court with Amotech's Section 1 claim, there is no evidence of concerted action. In view of Dyno's non-participation in the relevant market and the absence of concerted action to monopolize, Amotech's Section 2 claim against Dyno and Drillex is **DISMISSED.**

### Amotech's Claim under the Puerto Rico Dealers Act

 Amotech also alleges in its amended counterclaim that Dyno terminated its distribution agreement with Amotech without just case, in violation of the Puerto Rico Dealers Act, Law 75 of 1964. Dyno contends in its motion for summary judgment that it terminated its relationship with Amotech due to Amotech's repeated failures to pay on time, as stipulated in the Agreement, and that such reason constitutes "good cause", for purposes of Law 75. This Court agrees.

The Puerto Rico Dealers Act, Law 75 of June 24, 1964, as amended, 10 L.P.R.A. 278 et seq. reads, in pertinent part:

### Termination of relationship

Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, **except for just cause.** (Emphasis added)

10 L.P.R.A. 278a.

The Puerto Rico Dealers Act clearly authorizes termination of a relationship between a distributor and its dealer when there is "just cause" for its termination. Law 75 defines "just cause" as "nonperformance of any of the essential obligations of the dealer's contract on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interest of the principal or grantor in promoting the marketing or distribution of the merchandise or service." 10 L.P.R.A. 278(d). The law limits the definition of "just cause" to acts attributable to the dealer. *Warner Lambert v. Tribunal Superior De Puerto Rico*, 101 D.P.R. 378 (1973). In essence, when the dealer fails to comply with an essential obligation of the agreement or adversely affects in a substantial manner the interest of the principal, the principal can terminate the contract without payment of damages.

Dyno argues, and this Court agrees, that Amotech's refusal to pay its bills constituted just cause to terminate the agreement. From the beginning of the distributorship relationship, Amotech has repeatedly failed to make timely payments to Dyno. Despite repeated efforts by Dyno to set reasonable payment schedules, Amotech continued its untimely payments. Such delay eventually led to Dyno's filing of the present complaint. The First Circuit Court of Appeals has held that paying for goods on time is one of the bedrock essential obligations of the dealer's contract. *PPM Chemical Corp. of P.R. v. Saskatoon Chemical Ltd.*, 931 F.2d 138, 139 (1st Cir.1991).

In *PPM*, a Canadian manufacturer, Saskatoon Chemicals Ltd. ("Saskatoon") entered into an exclusive distribution agreement with PPM, under which it made PPM its Caribbean Distributor of calcium hypochlorite. Two years later, Saskatoon stopped selling to PPM on an exclusive basis due to PPM's poor performance. The First Circuit Court of Appeals found that PPM's failure to pay was "just cause" for termination of the exclusive agreement. Id.

We apply the same reasoning to the present case. Amotech's compliance with the payment terms of the Agreement was essential to Dyno. The Distribution Agreement includes several sections which underscore the importance of timely payments by Amotech, to wit: section 4C details the terms of payment (Docket # 93, Exhibit 2, par. 4C); section 6A notes that Dyno may require collateral at any time to secure full and complete payment (Id., Exhibit 2, par. 6A), and section 9b(1) stipulated that failure to make payments when due was an event which terminated the relationship immediately (Id., Exhibit 2, par. 9b(1)). The record shows that Dyno repeatedly required the payment of overdue amounts and that Amotech often responded by either not making any payments at all or failing to comply with its own proposed payment schedules. (Docket # 93, Dyno's Uncontested Facts Under Law 75, Exhibits 3–7).[4] Accordingly, the Court holds that Dyno did not incur in a violation of Law 75, since it terminated its relationship with Amotech for just cause. Since we have found that Dyno properly terminated its distribution relationship with Amotech due to the latter's untimely payments, we need not go any further into the nature of the distribution agreement between the parties. Pursuant to the case law and the analysis above, Amotech's Law 75 claim is **DISMISSED**.

**4.** According to the civil code which regulates contractual relationships in Puerto Rico, Dyno properly invoked the doctrine of *exceptio non adimpleti contractus,* that is, once a party fails to fulfill its obligations under the

## Amotech's Claim of Contractual Interference Against Drillex

Amotech claims that Drillex knew about the exclusive distribution agreement between Dyno and Amotech. Amotech contends that despite this knowledge, Drillex agreed to buy explosives material from Dyno at substantially reduced prices, thus interfering with the existing contractual relationship between Dyno and Amotech. This interference, argues Amotech severely undermined the contractual relationship between Dyno and Amotech, which led to a substantial loss of market share for Amotech. Thus, Amotech seeks to hold Dyno and Drillex jointly liable for the damages caused by such contractual interference.

This district court recently explained the requisites under which a plaintiff may recover for contractual interference. The Court explained in *Mr. (Vega Alta) v. Caribe General Elec. Products,* 31 F.Supp.2d 226 (D.Puerto Rico 1998) as follows: "Puerto Rico law provides a cause of action for tortious interference by third parties with contractual obligations. See 31 L.P.R.A. § 5141 (1990). To state a claim for interference with contracts under Puerto Rico law, there must be: (1) a contract with which a third person interferes; (2) fault or knowledge of the contract's existence; (3) damage to the plaintiff, and (4) causation. *General Office Products Corp. v. A.M. Capen's Sons, Inc.,* 780 F.2d 1077, 1081–82 (1st Cir.1986) (citing *General Office Products Corp. v. A.M. Capen's Sons, Inc.,* 115 D.P.R. 553 (1984))." Id. at 238.

Although Amotech properly alleges the first three elements of the contractual interference claim, it has been unable to present persuasive evidence that Dyno's sale of blasting caps to Drillex during the term of Amotech's relationship with Dyno

contract, the other party is no longer bound to comply with its own obligations. See *Mora Development v. Sandín,* 118 D.P.R. at 734; *Martínez v. Colón,* 89 JTS 109.

directly caused Amotech's financial losses and subsequent drop in its market share of the "explosives material" market. Accordingly, Amotech's claim of contractual interference against Dyno and Drillex is **DISMISSED.** Pursuant to the above discussion, the motions for summary judgment filed by Dyno and Drillex are **GRANTED** and Amotech's amended counterclaim and third-party complaint is **DISMISSED.** Judgment shall follow accordingly.

**SO ORDERED.**